| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA | JS-6 |

CIVIL MINUTES -- GENERAL

| | |
|---|---|
| Case No.   **CV 09-5013-JFW (JEMx)** | Date:  July 30, 2013 |
| Title:   United States of America, et al. -v- Scan Health Plan, et al. | |

**PRESENT:**

   HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING MOTION OF DEFENDANTS HEALTHCARE PARTNERS, LLC, HEALTHCARE PARTNERS MEDICAL GROUP, INC., AND HEALTHCARE PARTNERS INDEPENDENT PHYSICIAN ASSOCIATION TO DISMISS THIRD AMENDED COMPLAINT [filed 6/26/13; Docket No. 111];

ORDER GRANTING AETNA'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT [filed 6/26/13; Docket No. 112];

ORDER GRANTING DEFENDANT WELLPOINT, INC.'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT [filed 6/26/13; Docket No. 113]; and

ORDER GRANTING DEFENDANTS UNITEDHEALTH AND HEALTH NET'S MOTION TO DISMISS RELATOR'S THIRD AMENDED COMPLAINT [filed 6/26/13; Docket No. 114]

   On June 26, 2013, Defendants Healthcare Partners, LLC; Healthcare Partners Medical Group, Inc.; and Healthcare Partners Independent Physician Association (collectively, "Healthcare Partners") filed a Motion to Dismiss Third Amended Complaint ("Motion to Dismiss").  On June 26, 2013, Defendant Aetna filed a Motion to Dismiss Plaintiff's Third Amended Complaint ("Motion to Dismiss").  On June 26, 2013, Defendant WellPoint, Inc. ("WellPoint") filed a Motion to Dismiss Plaintiff's Third Amended Complaint ("Motion to Dismiss").  On June 26, 2013, Defendants United Healthcare Insurance Company, UnitedHealthCare Services Inc., UHIC, UnitedHealth Group,

UnitedHealthCare, United Health, PacifiCare Health Plan Administrators, UHC of California (f/k/a PacifiCare of California), PacifiCare Life and Health Insurance Company, PacifiCare Health Systems (collectively, the "UnitedHealth Defendants")[1], and Health Net filed a Motion to Dismiss Relator's Third Amended Complaint ("Motion to Dismiss").  On July 8, 2013, Plaintiff and *Qui Tam* Relator James M. Swoben ("Swoben") filed his Opposition.[2]  On July 15, 2013, Healthcare Partners filed a Reply.  On July 15, 2013, Aetna filed a Reply.  On July 15, 2013, WellPoint filed a Reply.  On July 15, 2013, the UnitedHealth Defendants and Health Net filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's July 29, 2013 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers[3], and the arguments therein, the Court rules as follows:

**I.    Factual and Procedural Background**

On July 13, 2009, Swoben filed his initial Complaint under seal, naming Defendants Scan Health Plan and Senior Care Action Network.  On September 30, 2009, Swoben filed his First Amended Complaint, which added SCAN Group (SCAN Group, Scan Health Plan, and Senior Care Action Network are collectively referred to as the "SCAN Defendants") and the UnitedHealth Defendants.  On October 19, 2010, Swoben filed his Second Amended Complaint.  On November 23, 2011, Swoben filed his Third Amended Complaint, which added WellPoint, Aetna, Health Net, and the Healthcare Partners.

On August 17, 2012, the SCAN Defendants, the United States, the State of California, and Swoben reached a settlement, and this case was dismissed as to the SCAN Defendants.  On or about January 8, 2013, the United States and the State of California declined to intervene in the action against the remaining defendants.  On January 8, 2013, the Court issued an order unsealing this action and directing Swoben to serve the Third Amended Complaint on the remaining defendants.

In the Third Amended Complaint, Swoben alleges the following claims for relief against the remaining defendants: (1) the third claim for relief for violation of 31 U.S.C. § 3729(a) against the UnitedHealth Defendants; (2) the fourth claim for relief for violation of California Government Code § 12651(a) against the UnitedHealth Defendants; (3) the ninth claim for relief for violation of 31 U.S.C. § 3729(a) against the UnitedHealth Defendants, Health Net, Aetna, WellPoint, and HealthCare Partners; and (4) the tenth claim for relief for violation of California Government Code § 12651(a) against the UnitedHealth Defendants, Health Net, Aetna, WellPoint, and HealthCare

---

[1] The UnitedHealth Defendants includes Defendant Secured Horizons, which Swoben specifically identifies in the third and fourth claims for relief.  However, Secured Horizons is a brand name and not a legal entity.

[2] Swoben filed a single Opposition in response to all four Motions to Dismiss.

[3] Although Swoben filed an improper Sur-Reply on July 16, 2013 [Docket No. 129] which was not considered by the Court, Swoben has not filed a motion for leave to amend the Third Amended Complaint.

Partners.  Based on the Notice of Dismissal of Fourth and Tenth Claims for Relief from Third Amended Complaint filed by Swoben on July 15, 2013, the Court entered an Order dismissing the fourth and tenth claims for relief on July 19, 2013.  Accordingly, only the third and ninth claims for relief remain at issue in this action, and those are the claims for relief the UnitedHealth Defendants, Health Net, Aetna, WellPoint, and HealthCare Partners seek to dismiss in their Motions to Dismiss.

In the third and ninth claims for relief, Swoben, a former employee of Defendant SCAN Health Plan, alleges that the health maintenance organizations defendants, the SCAN Defendants, the UnitedHealth Defendants, Health Net, Aetna, and WellPoint (collectively, the "HMO Defendants"), and their contracted medical group, HealthCare Partners, defrauded the Medicare Advantage program by committing a type of auditing fraud, which involved improperly designed and performed retrospective reviews, that resulted in overpayments by Medicare.

### A.     Medicare System and CMS

Medicare is a health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS"), designed to provide access to health insurance for Americans aged 65 and older, people under age 65 with certain disabilities, and people of all ages with End-Stage Renal Disease (permanent kidney failure requiring dialysis or a kidney transplant).  Eligible Medicare beneficiaries are provided a choice of either signing up for traditional fee-for-service ("FFS") coverage under Medicare Part A (Hospital Insurance) and Part B (Medical Insurance), or selecting a private plan option under Part C , which is also known as "Medicare Advantage."  42 U.S.C. § 1395w-21(a).

Under the traditional FFS model, physicians and hospitals (known as "providers") who care for beneficiaries are reimbursed directly by the federal government. Under Medicare Advantage, a private insurer ("MA Plan") is responsible for providing the benefits that traditional Medicare offers and, in return, receives capitated, per-member-per-month ("PMPM") payments from the federal government.  See 42 U.S.C. § 1395w-23(a)(1).  Because MA Plans receive the same monthly payment regardless of the volume of services a beneficiary actually uses, the MA Plan assumes the risk a beneficiary's expenses may exceed the capitated payment for that month.

Between 2000 and 2007, the federal government developed a system for adjusting monthly payments to MA Plans to reflect, in part, the health status of their beneficiaries.  See 42 U.S.C. § 1395w-23(a)(3).  Through "risk adjustment," the federal government sought to ensure that MA Plans are "paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees)." *Medicare Program: Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588, 4657 (Jan. 28, 2005).  To help accomplish this goal, risk adjusted capitated payments are partially based on beneficiary demographics and health status.  See 42 U.S.C. § 1395w-2 23(a)(1)(C)(I); 42 C.F.R. § 422.308(c).

Risk adjusted capitated payments to MA Plans take into account the relative severity of patient conditions as compared to the average Medicare FFS beneficiary.  42 U.S.C. § 1395w-23(a)(1)(C)(I); 42 C.F.R. § 6 422.308(c)(l).  Payments are adjusted by a "multiplier" (or "risk score") that enhances or lowers reimbursement to the MA Plan on a member-by-member basis depending on the member's relative expected health care expenditures under FFS Medicare as

compared to the average FFS beneficiary under Medicare.[4] 42 C.F.R. § 422.308(c). Because MA Plans are compensated on a relative system, the contracts fundamentally presume that both the MA Plans and Medicare will filter and treat diagnostic information the same way.

MA Plans do not themselves diagnose beneficiaries. Rather, MA Plans primarily receive diagnosis codes from providers (e.g., physicians and medical groups). MA Plans also separately retain coding companies to perform retrospective reviews of medical records relating to certain "encounters" (*e.g.*, patient visits to a doctor or hospital) to determine if the providers had properly reflected all the diagnosis codes for that encounter. Where appropriate, additional diagnosis codes identified in these reviews are transmitted to Medicare.[5]

Medicare groups certain diagnosis codes associated with each beneficiary and groups them into hierarchical condition categories ("HCCs"), which are disease groupings that predict average health care spending. 42 C.F.R. § 422.2. HCCs are used to "risk adjust" MA payments. *Id*. Because these HCCs are disease groupings, a number of different diagnosis codes can be properly linked to the same HCC (*e.g.*, the codes for liver transplants, heart transplants, and lung transplants, among others, all link to the HCC: "Major Organ Transplant Status").

B.  **CMS Audits**

CMS performs periodic risk adjustment data validation audits ("RADV") in which it assesses whether diagnosis codes that have been submitted were appropriately documented. When CMS conducts RADV audits, it seeks to determine, separate and apart from whether the patient in fact has the underlying condition, whether the particular medical chart under review sufficiently documents that the patient was seen by a provider with an appropriate physician specialty, who took the appropriate actions to diagnose that particular condition during that particular encounter. CMS's regulations provide that so long as a particular diagnosis is adequately documented by a single medical record, the diagnosis will be deemed valid, even if other medical charts fail to properly document that diagnosis. *See, e.g,* 42 C.F.R. § 422.31 l(c)(2)(i)(C) (requires the submission of only one medical record for purposes of appealing the results of an RADV audit). Thus, if multiple providers submit the same diagnosis code for a patient, there would be no impact

---

[4] Therefore, the more severe the diagnoses, the higher the risk scores, and, thus, the greater the capitated payments.

[5] A typical retrospective review will result in three categories of diagnosis codes: (1) diagnosis codes supported by properly documented medical charts that were already reported to Medicare shortly after healthcare services were performed on the patients; (2) new diagnosis codes supported by properly documented medical charts that were not previously reported to Medicare; and (3) diagnosis codes that were previously submitted to Medicare that are not supported by properly documented medical charts. Although a new diagnosis code for a patient encounter discovered during a retrospective review may be submitted to the federal government, any diagnosis codes discovered that were not supported by properly documented medical charts must be withdrawn. New diagnosis codes discovered during a retrospective review tend to increase the patients' risk scores, and, thus, increase capitated payments to the HMO. Diagnosis codes that are not supported by properly documented medical charts tend to decrease the patients' risk scores, and, thus, lower capitated payments to the HMO.

on the capitated payment due the MA Plan even if one of the diagnosis codes derived from a particular provider's records was later determined to lack adequate documentation.

In the Third Amended Complaint, Swoben alleges that between 2008 and 2011, the HMO Defendants and HealthCare Partners retrospectively reviewed the medical charts of tens of thousands of their Medicare Advantage patients and, after those reviews, HealthCare Partners failed to report the diagnosis codes that had previously been submitted to Medicare but were not supported by properly documented medical charts. Swoben alleges that, instead, HealthCare Partners only submitted new diagnosis codes to Medicare that were admittedly supported by properly documented medical charts but that had not been previously reported to Medicare, which resulted in artificially high risk scores for the patients and inflated capitated payments to the HMO Defendants. Swoben also alleges in conclusory fashion that the HMO Defendants were aware that HealthCare Partners' retrospective reviews were faulty because they were not designed or performed in a way that would discover previously submitted diagnosis codes that were not supported by properly documented medical charts.

As to the UnitedHealth Defendants, Swoben separately alleges that, beginning in 2005 and continuing to or about 2011, the UnitedHealth Defendants retained independent coding companies to perform retrospective reviews of its patients with severe illnesses. According to Swoben, although the UnitedHealth Defendants provided the coding companies with lists of patients whose charts were selected for review, the UnitedHealth Defendants concealed from the coding companies diagnosis codes for those patients that had been previously submitted to Medicare. As a result, Swoben alleges that the coding companies properly reported the new diagnosis codes supported by properly documented medical charts that had not been previously submitted, but were unable to report the unsupported diagnosis codes. Therefore, Swoben alleges in conclusory fashion that the concealment of the previously reported unsupported diagnosis codes ensured that the retrospective reviews would only result in higher capitated payments paid to the UnitedHealth Defendants by the federal government.

## II.   Legal Standard

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965.

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of

fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

### III. Discussion

#### A. Swoben's Claims for Violation of the False Claims Act Must Be Dismissed.

To allege a claim for violation of the False Claims Act, the plaintiff must allege specific facts to demonstrate that: (1) the defendant made a false statement or engaged in a fraudulent course of conduct; (2) the defendant did so with the required scienter; (3) the statement or course of conduct was material; and (4) the statement or course of conduct caused the government to pay out money of forfeit moneys due. *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).

In this case, it is undisputed that Swoben's third and ninth claims for relief alleged in the Third Amended Complaint fail to adequately allege claims for violation of the False Claims Act. In his Opposition, Swoben does not meaningfully oppose the arguments made by the UnitedHealth Defendants, Aetna, WellPoint, HealthCare Partners, and Health Net in their respective Motions to Dismiss as to why his third and ninth claims for relief are inadequate and, instead, Swoben simply asks the Court for leave to file a Fourth Amended Complaint. Accordingly, HealthCare Partners' Motion to Dismiss, Aetna's Motion to Dismiss, WellPoint's Motion to Dismiss, and the UnitedHealth Defendants and Health Net's Motion to Dismiss are granted and Swoben's third and ninth claims for relief are dismissed.

#### B. Leave to Amend Swoben's Claims for Violation of the False Claims Act Should Be Denied.

The remaining issue to be decided is whether the dismissal of the third and ninth claims for relief should be with or without leave to amend. Leave to amend a pleading is generally freely granted, and is within the discretion of the Court. Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S.

178, 182 (1962); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987) (citation omitted). In addition, leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000)). However, the liberality in granting leave to amend is subject to the qualification that amendment will not prejudice the opposing party, will not create undue delay, is not sought in bad faith, and does not constitute an-exercise in futility. *DCD Programs*, 833 F.2d at 186 (citations omitted); *see also Johnson v. Buckley*, 356 F.3d 1067 (9th Cir. 2004); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1482 (9th Cir.1997). After considering each of the relevant factors, the Court concludes that Swoben's claims should be dismissed without leave to amend.[6]

### 1. Leave to Amend Would Be Futile.

Claims brought pursuant to the False Claims Act are subject to the heightened pleading requirements of Rule 9(b). "In alleging fraud or mistake, Rule 9(b) requires a party to 'state with particularity the circumstances constituting fraud or mistake' including 'the who, what, when, where, and how of the misconduct charged.'" *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (*quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). "In addition, '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false.'" *Id.* (*quoting Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)). Although a plaintiff is not required to provide "representative examples of a false claim to support every allegation," he must at least allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*; *see also United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (explaining that Rule 9(b) requires that a complaint be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong").

Although Swoben has been able to generally allege his view of an alleged fraudulent scheme, Swoben at this late date and after three attempts to amend his Complaint is still unable to allege the actual false representations, the makers of the false statements, and facts, as opposed to Swoben's speculation, that plausibly demonstrate the federal government was actually overcharged. *See, e.g., United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("It is not enough to describe a fraudulent scheme in detail but then to allege simply and without any stated reason . . . that claims requesting illegal payments must have been submitted"). The Court may not make any assumptions about the defendants'

---

[6] On July 9, 2013, the Court issued an Order to Show Cause Re Sanctions, which required Swoben, among other things, to file a declaration which described "in detail the proposed Fourth Amended Complaint and why such an amendment would not be futile or denied due to evidence of a lack of diligence or undue delay." On July 12, 2013, Swoben filed the Declaration of William K. Hanagami in Response to July 9, 2013 Order to Show Cause Re Proposed First [*sic*] Amended Complaint ("Hanagami Declaration") and the Declaration of Abram J. Zinberg ("Zinberg Declaration"). In determining that leave to amend should be denied, the Court has considered not only the arguments made and facts presented in Swoben's Opposition, but also the facts presented in the Hanagami and Zinberg Declarations.

submission of actual claims to the federal government without stripping all meaning from Rule 9(b)'s mandate of specificity or ignoring "the true essence of the fraud," which involves an actual claim for payment from the federal government and not merely a preparatory scheme. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006). In this case, even with the "new" facts Swoben states he would allege in a Fourth Amended Complaint, his claims would still be defective because he: (1) fails to describe the HealthCare Partners' retrospective review process with particularity, including the types of charts reviewed or whose charts were reviewed; (2) fails to allege that the reviewed charts belonged to members of the HMO Defendants' Medicare Advantage plans; (3) fails to allege with any particularity the HMO Defendants' involvement, if any, in the HealthCare Partners retrospective review process or the nature and extent of the HMO Defendants' knowledge of the reviews; (4) fails to allege any specific diagnosis codes that were submitted to the federal government that were actually false; and (5) fails to allege that he has reviewed any of the medical records associated with HealthCare Partners' patients to determine whether particular diagnosis codes were unsupported by those medical records.

Therefore, the Court concludes that granting Swoben leave to amend his third and ninth claims for relief for violation of the False Claims Act would be futile because after three prior attempts to amend his Complaint, he has failed to demonstrate that he can allege additional facts to satisfy the level of particularity required under Rule 9(b).[7] At best, Swoben's proffered new facts simply expand his view of the fraudulent scheme, but, as the Ninth Circuit held in *Cafasso*, even a detailed description of a fraudulent scheme without factual allegations that demonstrate that claims requesting illegal payments were submitted to the federal government is insufficient.[8]

In addition, leave to amend Swoben's third and ninth claims for relief for violation of the False Claims Act would be futile because his claims are based on publicly available information. The False Claims Act requires the dismissal of claims that are based on information that has been "publicly disclosed," unless the plaintiff is the "original source" of that information. 31 U.S.C. § 3730(e)(4)(A). The public-disclosure bar in Section 3730(e)(4)(A) establishes a two-tiered inquiry: (1) it must be determined "whether there has been a prior 'public disclosure' of the 'allegations or transactions' underlying the qui tam suit"; and (2) "[i]f and only if there has been such a public disclosure," it must next be determined "whether the relator is an 'original source' within the meaning of § 3730(e)(4)(B)." *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000). An "original source" is an individual who either: (i) has prior to a public disclosure

---

[7] This conclusion is supported by the fact that the federal government has declined to intervene in this action. *See, e.g., United States ex rel. Black v. Health & Hospital Corp. Of Marion County*, 2011 WL 1161737 (D. Md. Mar. 28, 2011) (holding that dismissal of complaint with prejudice was appropriate where "Relator, now on the fourth iteration of his complaint, in the second U.S. District Court, and after the government has twice declined to intervene, fails to provide sufficiently particular allegations of Defendants' fraudulent activities").

[8] In addition, any argument that Swoben will be able to amend his complaint to comply with the requirements of Rule 9(b) after he has had the opportunity to conduct discovery is unpersuasive. The purpose of Rule 9(b) is to require a plaintiff to demonstrate that there is some substance to his "claim of fraud before a defendant will be subjected to the rigors of the discovery process." *U.S. ex rel. Riley v. Alpha Therapeutic Corp.*, 1997 WL 818593, *4 (N.D. Cal. Nov. 10, 1997).

under subsection (e)(4)(a), has voluntarily disclosed to the federal government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the federal government before filing an action under this section. 31 U.S.C. § 3730(e)(4)(B). To qualify as an original source, "a plaintiff must have direct and independent knowledge of the information on which the allegations are based." *Battle v. Board of Regents for Georgia*, 468 F.3d 755, 762 (11th Cir. 2006). Where the plaintiff fails to provide the district court with "specific facts showing that [he] had direct and independent knowledge of the [information] on which [he] bases [his] FCA claims," dismissal for lack of subject-matter jurisdiction is appropriate. *Id.*

In this case, the majority of "new" facts Swoben seeks to add to his Fourth Amended Complaint, including the error rates for RADV audits, are publicly available in CMS reports and other documents, such as *Payment Accuracy, Medicare Advantage (Part C)* and *Pillsbury Client Alert*. In addition, Swoben fails to allege, nor does it appear that he could, that he is the original source of this information. Therefore, even if Swoben's "new" factual allegations were specific enough to support his claims for violation of the False Claims Act, they would still fail to support his claims because they are based on publicly available information. Accordingly, amendment of Swoben's third and ninth claims for relief would be futile.

### 2. Swoben Unduly Delayed in Amending his Claims for Violation of the False Claims Act.

In addition, leave to amend is denied based on undue delay. In most situations, undue delay by itself is insufficient to justify denying a request to amend. *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). However, in some egregious cases, delays may be sufficient on their own to deny amendment. *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006). Under the undue delay analysis, a relevant inquiry is also whether the plaintiff "knew or should have known the facts and theories raised by amendment in the original pleading." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990).

In this case, it is clear that Swoben was aware of the purportedly "new" allegations he proposes to add to the Fourth Amended Complaint since at least 2005. Zinberg Declaration, 2:28-3:2. For example, Swoben became aware that the HMO Defendants and HealthCare Partners used an Excel spreadsheet to submit retrospective review information to Medicare that did not allow for the submission of unsupported diagnosis codes "while employed with SCAN" (Hanagami Declaration, 7:28-8:9), which was "[b]etween March 2004 and September 2006" (Third Amended Complaint, ¶ 8), and well before he filed his original Complaint on July 9, 2009. Because the facts and theories in Swoben's proposed Fourth Amended Complaint were admittedly known to him "since the inception of the cause of action" (*Royal Insurance Co. Of America v. Southwest Marine*, 194 F.3d 1009, 1017 (9th Cir. 1999)), and because Swoben has not offered any credible explanation for "his failure to develop his contentions originally" (*Allen v. City of Beverly Hills*, 911 F.2d 367, 364 (9th Cir. 1990)), leave to amend is denied.

Accordingly, the third and ninth claims for relief in Swoben's Third Amended Complaint are dismissed without leave to amend.

## IV. Conclusion

For all the foregoing reasons, HealthCare Partners' Motion to Dismiss, Aetna's Motion to Dismiss, WellPoint's Motion to Dismiss, and the UnitedHealth Defendants and Health Net's Motion to Dismiss are **GRANTED**, and Swoben's third and ninth claims for relief for violation of the False Claims Act are **DISMISSED without leave to amend** as to HealthCare Partners, Aetna, WellPoint, the UnitedHealth Defendants, and Health Net.  Accordingly, Swoben's Third Amended Complaint is **DISMISSED with prejudice** as to HealthCare Partners, Aetna, WellPoint, the UnitedHealth Defendants, and Health Net.

IT IS SO ORDERED.