**William K. Hanagami, SBN 119832**
**THE HANAGAMI LAW FIRM**
**A PROFESSIONAL CORPORATION**
**5950 CANOGA AVENUE, SUITE 130**
**WOODLAND HILLS, CA 91367-7572**
**(818) 716-8570 / (818) 716-8569 *FAX***
**BillHanagami@esquire.la**

**Abram J. Zinberg, SBN 143399**
**THE ZINBERG LAW FIRM**
**A PROFESSIONAL CORPORATION**
**412 OLIVE AVENUE, SUITE 528**
**HUNTINGTON BEACH, CA 92648**
**(714) 960-9917 / (714) 374-9802 *FAX***
**AbramZinberg@gmail.com**

Attorneys for Plaintiff and Qui Tam Relator, James M. Swoben

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel* JAMES M. SWOBEN,

Plaintiffs,

vs.

SECURE HORIZONS, a business entity, form unknown; United Healthcare INSURANCE COMPANY, a Connecticut corporation; UNITED HEALTHCARE SERVICES, INC., Minnesota corporation; UHIC, a business entity, form unknown; UNITEDHEALTH GROUP, a business entity, form unknown; UNITEDHEALTHCARE, a business entity, form unknown; UNITEDHEALTH, a business entity, form unknown; PACIFCARE HEALTH PLAN ADMINISTRATORS, INC., a corporation; PACIFICARE OF CALIFORNIA, a corporation; PACIFICARE LIFE AND HEALTH INSURANCE COMPANY, a corporation; PACIFICARE HEALTH SYSTEMS, a corporation; HEALTHCARE PARTNERS, a business entity, form unknown; HEALTHCARE PARTNERS MEDICAL GROUP, a business entity, form unknown; and HEALTHCARE

CASE NO.: CV09-5013 JFW(JEMx)

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT; REQUEST FOR JURY TRIAL

PARTNERS INDEPENDENT PHYSICIAN ASSOCIATION, a business entity, form unknown,

Defendants.

COMES NOW, Plaintiff and Qui Tam Relator James M. Swoben, individually and on behalf of the United States of America, and alleges as follows:

JURISDICTION AND VENUE

1. Plaintiff and Qui Tam Relator James M. Swoben (Swoben) files this action on behalf and in the name of the United States Government ("Government") seeking damages and civil penalties against the defendants for violations of 31 U.S.C. § 3729(a).

2. This Court's jurisdiction over the claims for violations of 31 U.S.C. § 3729(a) is based upon 31 U.S.C. § 3732(a).

3. Venue is vested in this Court under 31 U.S.C. § 3732(a) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in the Central District of California.

THE PARTIES

4. Swoben is a resident and citizen of the United States, the State of California, and of this District. Swoben brings this action of behalf of the Government under 31 U.S.C. § 3730(b).

5. At all times relevant, the Government funded the Medicare program which provides payment of healthcare services for, among others, those 65 years or older. The Government provided a Medicare option known as Medicare+Choice, now known as Medicare Advantage (MA), in which eligible Medicare beneficiaries can enroll under a MA health plan with a Medicare Advantage Organization (MAO) contracted with the Government for a capitated rate paid by the Government that would provide at least those services provided to standard Medicare beneficiaries.

6. Defendant United Healthcare Insurance Company is and was a corporation formed under the laws of the State of Connecticut, and transacted business in, among other places, the Central District of California. Defendant United Healthcare Services, Inc. is and was a corporation formed under the laws of the State of Minnesota, and transacted business in, among other places, the Central District of California. Defendants UHIC, UnitedHealth Group, UnitedHealthcare, UnitedHealth, and Secure Horizons are business entities, form unknown, that transacted business in, among other places, the Central District of California. Defendants Pacificare Health Plan Administrators, Inc., Pacificare of California, Pacificare Life and Health Insurance Company, and Pacificare Health Systems are corporations formed under the laws of one or more states of the United States, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred in this Complaint as “United Healthcare” and are or were Medicare Advantage Organizations (MAOs).

7. Defendants HealthCare Partners, HealthCare Partners Medical Group, and HealthCare Partners Independent Physician Association are business entities, form unknown, that transacted business in, among other places, the Central District of California. Swoben is informed and believes, and upon such information and belief alleges, that during the pendency of this action (a) defendant HealthCare Partners merged with and/or is now known as DaVita Medical Management, LLC, and (b) defendant HealthCare Partners Medical Group merged with and/or is now known as DaVita Medical Group California, Inc. All entities referenced in this paragraph are collectively referred in this Complaint as “HealthCare Partners.”

8. At all times relevant, United Healthcare contracted with the Government to provide healthcare services to Medicare eligible patients under the MA program.

9. At all times relevant in California, among other places, United Healthcare contracted with a number of numerous medical groups and independent physician associations (IPAs), including but not limited to HealthCare Partners, to provide medical services to the United Healthcare’s MA patients. Such medical groups and IPAs entered into written contracts with United Healthcare, among other MAOs, to accept the majority of financial risk

and obligation to provide MA healthcare services to the contracted MAO's MA patients, and in exchange, such medical groups and IPAs, including but not limited to HealthCare Partners, received a percentage of the monthly capitated premiums the Government paid to the MAO.

10. At all times relevant, United Healthcare's MA contracts with the Government and 42 C.F.R. § 422.504(i)(1) provided and required United Healthcare to maintain ultimate responsibility for its contracted medical groups and IPAs, including but not limited to HealthCare Partners, adhering and fully complying with all terms and conditions of such contracts, including but not limited to the requirements that diagnosis codes submitted to the Government must be supported by properly documented medical charts.

11. At all times relevant, United Healthcare's MA contracts with the Government and 42 C.F.R. § 422.504(i)(4)(iii) required United Healthcare to actively monitor the activities of its contracted medical groups and IPAs, including but not limited to HealthCare Partners, on an ongoing basis. These provisions required United Healthcare to actively monitor the design, utilization and performance of retrospective reviews of medical charts, and to determine whether they were properly designed, utilized and performed. As discussed below, United Healthcare knowingly violated these duties by knowingly designing, utilizing and/or performing retrospective reviews of medical charts of its MA beneficiaries that concealed from (and did not withdraw from) the Government previously submitted diagnosis codes that were unsupported by the reviewed medical charts.

<u>Risk Adjustment</u>

12. At all times relevant, Section 1853(a)(3) of the Social Security Act [42 U.S.C. § 1395w-23(a)(3)] required the Government's Centers for Medicare and Medicaid Services (CMS) to risk adjust payments to MAOs, such as United Healthcare. In general, the risk adjustment methodology relied on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification guidelines (ICD-9), and later the International Classification of Disease, Tenth Revision Clinical Modification guidelines (ICD-10), to prospectively adjust capitation payments for each enrollee based on the health status of the enrollee. Diagnosis codes (ICD-9/ICD-10 codes) submitted by MAOs, such as

United Healthcare, to CMS were used to develop Hierarchical Condition Category (HCC)[1] risk scores that are used by the Government to adjust the capitated payment rates paid by the Government to that particular MAO. The risk scores compensated an MAO with a population of patients with more severe illnesses than normal through higher capitation rates. Likewise, an MAO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients. By risk adjusting MAO payments, CMS attempts to make appropriate and accurate payments to MAOs for enrollees with differences in expected healthcare costs. Risk adjustment data (RAD) records the health status and demographic characteristics of an enrollee. This process was phased in beginning in or about 2000 and was completed by or about 2006 such that CMS's payments during and after 2007 payments were 100% risk adjusted.

13. At all times relevant, HealthCare Partners provided medical services to the MAO patients of, and under various contracts with, various MAOs, including but not limited to United Healthcare. United Healthcare, as did other MAOs, utilized the diagnosis codes of its MA patients receiving treatment from such MAOs' various contracted healthcare providers, including but not limited to HealthCare Partners, to develop HCC risk scores that the Government used to risk adjust the capitated payment rates paid to United Healthcare.

14. At all times relevant, United Healthcare, as did other MAOs, submitted diagnoses codes of its MA patients to the Government shortly after such patients received medical treatment and/or had encounters with their healthcare providers, such as HealthCare Partners. Under applicable Medicare regulations, including but not limited to 42 C.F.R. §§ 422.310(d) and 422.504(*l*), and CMS's Risk Adjustment Guide, MAOs, such as United Healthcare, can only submit diagnosis codes to the Government that are supported by properly documented medical charts.

[1]Not all diagnoses result in a HCC risk score. Only certain diagnosis codes or combinations thereof result in HCC risk scores. A HCC risk score will vary upon the diagnosis codes of combinations thereof according to a matrix determined by the Government.

15. The final cut-off for MAOs, including United Healthcare, to submit their patients' RAD, including ICD-9/ICD-10 codes, to CMS for a particular calendar year was January 31 of the second subsequent calendar year. For example, for dates of service in 2008, the final cut-off was January 31, 2010. CMS used this data and adjusted the payments to MAOs, including United Healthcare, based on the HCC risk scores once every six months.

Retrospective Reviews

16. A retrospective review is the review of medical charts to determine the diagnosis codes supported by the properly documented medical charts, and is performed after the MAO and/or healthcare provider has already submitted diagnosis codes to the Government (at or about the time the services were provided to the MA patient). The legitimate purpose of a retrospective review is to more accurately report to the Government the diagnosis codes supported by properly documented medical charts. (*See,* Medicare regulations, including but not limited to 42 C.F.R. §§ 422.310(d) and 422.504(*l*), and CMS's Risk Adjustment Guide.) Although a MAO may submit to the Government diagnosis codes for any particular patient encounter uncovered from the retrospective review that was not previously submitted to the Government, the MAO must also withdraw previously submitted diagnosis codes that were unsupported by properly documented medical charts reviewed in the retrospective review. As discussed below, defendants designed, utilized and/or conducted retrospective reviews that resulted in only adding diagnosis codes that were not previously reported to the Government (which raised the defendants' MA patients' risk scores and resulting payments by the Government to defendants), but concealed, and failed and refused to withdraw, diagnosis codes previously reported to the Government that were unsupported by the reviewed medical charts (which would have lowered defendants' MA patients' risk scores and thus lowed payments by the Government to defendants).

17. Beginning in or about 2005 and at least once per year thereafter, United Healthcare and/or HealthCare Partners retained coding companies and/or purchased specialized software to perform retrospective reviews of the medical charts of tens of thousands of their patients with severe illnesses. During or about 2005 through about 2007,

United Healthcare paid its contracted medical groups and IPAs, including but not limited to HealthCare Partners, between $40 and $45 for every medical chart reviewed by them. Although such defendants provided their own in-house coders and physicians or coding companies (collectively, "coders") with the lists of MA patients whose charts were to be reviewed, defendants concealed from the coders the diagnosis codes that had been previously submitted to the Government.

18. The coders conducted their review of the medical charts of tens of thousands of United Healthcare's MA patients, determined the diagnosis codes that were supported by proper documentation of the reviewed medical charts, and provided their results to United Healthcare. The coders' reviews resulted in (a) diagnosis codes that were supported by proper documentation of the reviewed medical charts that had been previously submitted to the Government, and (b) new diagnosis codes that were supported by proper documentation of the reviewed medical charts that had not been previously submitted to the Government. However, a large number of the reviewed medical charts did not contain proper documentation supporting the previously submitted diagnosis codes. Because defendants concealed from the coders what diagnosis codes had been previously submitted to the Government, the results of the coders' reviews did not identify the diagnosis codes unsupported by proper documentation of the reviewed medical charts that had been previously submitted to the Government.

19. Between and during about 2005 to at least 2007, United Healthcare used software, such as Plan Data Management, to create lists of patients whose medical charts were to be reviewed. These lists showed the patients that were susceptible of having HCC diagnoses that had not been previously reported, and identified the HCC diagnosis codes that were believed to be unreported. United Healthcare provided these lists to its contracted medical groups and IPAs, including but not limited to HealthCare Partners, who in turn had the lists used by coders to review the charts of the listed patients to determine whether the reviewed charts supported the HCC diagnosis codes identified on the lists. Such medical groups and IPAs, including but not limited to HealthCare Partners, reported to United Healthcare the HCC diagnosis codes that were supported by properly documented medical

charts that were reviewed, but made no attempt to determine or report those previously reported diagnosis codes that were unsupported by properly documented medical charts that were reviewed. HealthCare Partners did so with the knowledge and intent that the coders' reviews would only increase, and not decrease, the number and severity of diagnoses, and the respective risk scores in order to increase capitated payments paid by the Government to United Healthcare, of which HealthCare Partners received a portion.

20. United Healthcare and HealthCare Partners improperly conceived, planned, utilized and conducted the coders' reviews by not causing the previously submitted diagnosis codes that were unsupported by the coders' reviews to be corrected and withdrawn from the Government. Rather, the procedures and methods developed and used by HealthCare Partners and United Healthcare were biased in favor of "up coding" the patients' diagnoses because the previously submitted diagnoses that were unsupported by the coders' reviews were concealed, and not identified and withdrawn, from the Government. HealthCare Partners and United Healthcare did so with the knowledge and intent that the coders' reviews would only increase, and not decrease, the number and severity of HCC diagnoses, and thus their respective risk scores in order to increase capitated payments paid by the Government.

21. During and after June 2008, HealthCare Partners utilized software, HCC Manager, to evaluate claims data and retrospectively reviewed the medical charts of tens of thousands of HealthCare Partners' patients (that were MA patients of United Healthcare and other MAOs) with severe illnesses. HealthCare Partners did so, even though the manufacturer of HCC Manager advised HealthCare Partners that the software should not be used for retrospective reviews because such use would create Medicare compliance violations. Healthcare Partners used the data generated by HCC Manager for prospective care, as well as retrospective review, of its Medicare patients' medical charts for previous years' submissions.

22. HealthCare Partners conducted its review of the medical charts of thousands of its patients, determined the diagnosis codes that were supported by proper documentation of the reviewed medical charts, and provided their results to its various contracted MAOs, including but not limited to United Healthcare. HealthCare Partners' reviews resulted in (a)

diagnosis codes that were supported by proper documentation of the reviewed medical charts that had been previously submitted to the Government, and (b) new diagnosis codes that were supported by proper documentation of the reviewed medical charts that had not been previously submitted to the Government. However, a large number of the reviewed medical charts did not contain proper documentation supporting the previously submitted diagnosis codes. The results of HealthCare Partners' retrospective reviews concealed and did not identify the diagnosis codes unsupported by proper documentation of the reviewed medical charts that had been previously submitted to the Government.

23. United Healthcare and HealthCare Partners made no effort to advise the Government of the diagnosis codes for the reviewed medical charts that were unsupported by proper documentation, and made no effort to identify and withdraw from the Government the previously submitted diagnosis codes that were unsupported by proper documentation of the reviewed medical charts.

24. United Healthcare and HealthCare Partners improperly conceived, planned, utilized and conducted the retrospective reviews by not causing the previously submitted diagnosis codes that were unsupported by the retrospective reviews to be identified, corrected and withdrawn from the Government. Rather, the procedures and methods developed and used were biased in favor of increasing the MA patients' HCC diagnoses and thereby inflating their HCC risk scores because the previously submitted diagnoses that were unsupported by the reviewed medical charts were not identified, corrected and withdrawn from the Government. United Healthcare and HealthCare Partners did so with the knowledge and intent that the retrospective reviews would only increase, and not decrease, the number and severity of their MA patients' HCC diagnoses, and thus their respective risk scores in order to inflate capitated payments paid by the Government.

25. During or about 2005 to at least 2012, United Healthcare and HealthCare Partners routinely submitted to the Government the diagnosis codes determined by the coders' and/or HealthCare Partners' reviews, knowing that the effect of such submissions would only increase the number and severity of their MA patients' HCC diagnoses, and thus artificially

inflate their respective risk scores and capitated payments.

RAPS and the Excel Template

26. At all times relevant since about 2005, United Healthcare, as did all other MAOs, submitted RAD to CMS monthly using a Risk Adjustment Processing System (RAPS) electronic file format required by CMS. Since at least 2005, CMS's RAPS file format has had a field to be used to indicate that a previously submitted ICD-9/ICD-10 code is to be deleted.

27. The Industry Collaborative Effort for Healthcare (ICE) was a not-for-profit organization that developed and provided training materials and standardized reporting templates to be used by managed care medical groups and IPAs, including but not limited to HealthCare Partners, and MAOs, including but not limited to United Healthcare. ICE's members were risk adjustment professionals employed with various MAOs and their contracted medical groups and IPAs, including but not limited to United Healthcare and HealthCare Partners. ICE was organized into various teams by topic. During or about 2006, ICE tasked its Risk Adjustment Data Acquisition Report (RADAR) team to address issues related to reporting RAD to CMS. United Healthcare and HealthCare Partners, among others, participated in ICE and the RADAR team as well as a majority of United Healthcare's contracted medical groups and IPAs in California. For instance, during or about 2005 and 2006, United Healthcare's employees, including but not limited to Pam Leal and Pamela Holt, were involved in the governance of ICE and the leadership of the RADAR team. Also, during and after that time, HealthCare Partners employee, David Suh, among others, were ICE members. Such ICE members were involved in the design, implementation and/or approval of the ICE-RADAR template discussed below.

28. The main issue addressed by the RADAR team was the collection of retrospective review RAD. MAOs' (including but not limited to United Healthcare) and their contracted medical groups' and IPAs' (including but not limited to HealthCare Partners) data collection software would not allow the entry of additional ICD-9/ICD-10 codes for duplicate dates of service if the physician provider and the beneficiary were identical. This restriction prevented United Healthcare and HealthCare Partners from adding the results of their

retrospective reviews to their data collection software systems. The RADAR team's solution was to create a template utilizing an Excel spreadsheet. Using the template, coders would (and did) enter the patient demographic data and any additional ICD-9/ICD-10 codes that had not been previously reported directly onto the Excel spreadsheet which the MAOs, including but not limited to United Healthcare, agreed to accept. However, the template did not permit the entry of information indicating what previously submitted ICD-9/ICD-10 codes should be withdrawn, even though CMS's RAPS file format had a field to be used to indicate that a previously submitted ICD-9/ICD-10 code is to be deleted. Accordingly, the Excel spreadsheet did not contain data that would have resulted in the withdrawal of previously submitted ICD-9/ICD-10 codes that were unsupported by properly documented medical charts. MAOs, including but not limited to United Healthcare, downloaded the data from the Excel spreadsheet received from contracted medical groups and IPAs, including but not limited to HealthCare Partners, into the CMS-approved RAPS submission file format and transmitted the information to CMS.

29. The ICE-RADAR template was used by the United Healthcare and other MAOs and their contracted medical providers, such as HealthCare Partners, during and between about 2006 to at least 2012. During 2012, the ICE-RADAR template was purportedly modified to be used for both adding and deleting ICD-9/ICD-10 codes.

30. Since at least 2006, United Healthcare's employees, including but not limited to Pam Leal and Pamela Holt, and HealthCare Partners employees, including but not limited to David Suh, were aware that the RADAR template did not permit the entry of information indicating what previously submitted ICD-9/ICD-10 codes should be withdrawn, even though CMS's RAPS file format had a field to be used to indicate that a previously submitted ICD-9/ICD-10 code is to be deleted.

31. The failure of the ICE-RADAR template to capture data indicating what previously submitted diagnosis codes should be withdrawn was intentional. All of the ICE members employed by United Healthcare and HealthCare Partners knew that the ICE-RADAR template would not capture retrospective review data indicating what previously submitted

diagnosis codes should be withdrawn because each such ICE member knew that the retrospective reviews were designed, utilized and performed to only add new diagnosis codes, and not to identify nor withdraw from CMS previously submitted diagnosis codes unsupported by the reviewed medical charts.

32. In spite of knowing that the ICE-RADAR template would not collect data needed to delete previously submitted diagnosis codes that were unsupported by the retrospectively reviewed medical charts, at all times relevant United Healthcare and its contracted medical groups and IPAs, including but not limited to HealthCare Partners, agreed among themselves to utilize the ICE-RADAR template knowing that the template and the retrospective reviews were not designed, utilized nor performed to identify nor withdraw from CMS previously submitted diagnosis codes that were unsupported by the reviewed medical charts.

RADV Audits

33. At all times relevant, CMS conducted annual Risk Adjustment Data Validation (RADV) audits of a sample of medical charts of MA patients of, and selected by, MAOs, including but not limited to United Healthcare. (*See*, 42 C.F.R. § 422.311.) The RADV audits determined, among other things, the percentage of the medical charts reviewed in the RADV audit that did not support the HCC risk scores determined from the diagnosis codes for such patients submitted by MAOs to CMS. At all times relevant, defendants knew that United Healthcare and HealthCare Partners' other contracted MAOs, such as CIGNA, had RADV audit error rates well in excess of 30%, reflecting that more than 30% of such MAO's diagnosis codes submitted to CMS were unsupported by properly documented medical charts. Defendants further knew that United Healthcare and HealthCare Partners' other contracted MAOs, such as CIGNA, only withdrew the previously submitted diagnosis codes for those patients whose submissions failed the RADV audit, and did not review other patients' medical charts and withdraw previously submitted diagnosis codes that were unsupported by properly documented medical charts.

Frauds

34. United Healthcare and HealthCare Partners knew that their retrospective reviews were improperly designed, performed and reported because additional ICD-9/ICD-10 codes were reported to CMS and virtually no ICD-9/ICD-10 codes were withdrawn as a result of the retrospective reviews.

35. At all times relevant, as an express condition to receiving monthly capitation payments from the Government under the MA program, United Healthcare's MA contracts with the Government and 42 C.F.R. § 422.504(*l*) required United Healthcare to periodically (and at least annually) certify that the RAD submitted to the Government was accurate, complete and truthful. At all times relevant, United Healthcare provided the Government such certifications periodically and at least annually. Likewise, MAO's (including but not limited to United Healthcare's) contracts with HealthCare Partners and 42 C.F.R. § 422.504(*l*)(3) required HealthCare Partners to periodically (and at least annually) certify that the RAD it generated and submitted is accurate, complete and truthful. United Healthcare's and HealthCare Partners' certifications were knowingly false and fraudulent because United Healthcare and HealthCare Partners knew that the retrospective review results submitted to CMS were faulty and deficient because (a) said defendants had employees that were part of ICE and/or RADAR and knew that the ICE-RADAR template would not capture data required to notify CMS the unsupported ICD-9/ICD-10 codes were to be withdrawn, (b) United Healthcare and HealthCare Partners' other contracted MAOs, such as CIGNA, had RADV audit error rates well in excess of 30% and knew that a similar percentage of retrospectively reviewed medical charts should have resulted in ICD-9/ICD-10 codes being withdrawn as unsupported by the reviewed medical charts, (c) the retrospective reviews were designed by defendants to not identify nor withdraw from CMS the previously submitted ICD-9/ICD-10 codes that were unsupported by the reviewed medical charts, and/or (d) United Healthcare knew that virtually no ICD-9/ICD-10 codes were withdrawn as a result of the retrospective reviews because its RAPS file submissions to CMS did not contain information necessary to withdraw previously submitted diagnosis codes that were unsupported by the reviewed

medical charts.

36. Defendants made no effort to advise or withdraw from the Government the previously submitted diagnosis codes that were unsupported by proper documentation of the reviewed medical charts.

37. Further, the defendants had a duty to have compliance programs in place to monitor and detect attempts to artificially increase risk scores and capitated payments arising from the subject retrospective reviews. Instead, at all times mentioned defendants knowingly failed and refused to have compliance programs in place to detect and stop their improper retrospective reviews and failures to identify and withdraw from CMS previously reported diagnosis codes that were unsupported by the reviewed medical charts. Defendants failed and refused to have such compliance programs in place because defendant's improper retrospective review practices were highly profitable to defendants.

38. As a result of the acts and concealments of defendants, their respective capitated payments paid by the Government became inflated due to the artificially high risk scores.

39. At all times mentioned, defendants routinely and repeatedly violated 31 U.S.C. § 3729(a) by:

i. United Healthcare knowingly making, using, and/or causing to make or use false records, statements or claims to get false claims for payment or approval under its MA contracts during and after 2005;

ii. HealthCare Partners knowingly making, using, and/or causing to make or use false records, statements or claims to get false claims for payment or approval under (a) its contracted MAO's (including United Healthcare) MA contracts during and after 2005, and/or (b) its contracts with MAOs (including United Healthcare) during and after 2005;

iii. Improperly retaining and concealing from the Government the unsupported diagnosis codes from the reviewed medical charts and resulting inflated risk scores that inflated the capitated payments United Healthcare received under its MA contracts, and HealthCare Partners'

contracts with MAOs (including but not limited to United Healthcare) during and after 2005;

iv. Knowingly making, using and/or causing to make or use false records and statements to conceal, avoid, or decrease its obligation to (a) withdraw from CMS previously reported diagnosis codes that were unsupported by the reviewed medical charts, and (b) return to the Government the inflated capitated payments and funds it received during and after 2005; and/or

v. Knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

40. As a result of their conduct, defendants are liable to the Government for three times the amount of damages sustained by the Government as a result of the false and fraudulent billing, reporting, records, statements, claims and/or concealment practices alleged above.

41. As a result of defendants' conduct, 31 U.S.C. § 3729(a) provides that defendants are liable to the Government for civil penalties between $5,000 and $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each such false and fraudulent billing, reporting, records, statements, claims and/or concealment.

42. Swoben is also entitled to recover his attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

/ / /

/ / /

PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Qui Tam Relator James M. Swoben prays for relief as follows:

FOR THE FIRST CLAIM FOR RELIEF

1. Treble the Government's damages according to proof;

2. Civil penalties according to proof;

3. A relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

4. Attorneys fees, expenses, and costs; and

5. Such other and further relief as the Court deems just and proper.

THE ZINBERG LAW FIRM
A Professional Corporation

THE HANAGAMI LAW FIRM
A Professional Corporation

Dated: March 13, 2017

By: */s/William K. Hanagami*
William K. Hanagami
Attorneys for Plaintiff and Qui Tam Relator, James M. Swoben

REQUEST FOR JURY TRIAL

Plaintiff and Qui Tam Relator James M. Swoben hereby requests a trial by jury.

THE ZINBERG LAW FIRM
A Professional Corporation

THE HANAGAMI LAW FIRM
A Professional Corporation

Dated: March 13, 2017

By: */s/William K. Hanagami*
William K. Hanagami
Attorneys for Plaintiff and Qui Tam Relator, James M. Swoben

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

I am over the age of 18 and not a party to the within action. I am employed in the County of Los Angeles, State of California. My business address is at 5950 Canoga Avenue, Suite 130, Woodland Hills, California 91367.

On the date set forth below, I served the foregoing document described as:

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT; REQUEST FOR JURY TRIAL

on all parties and/or their attorneys of record to the action as follows:

SEE ATTACHED SERVICE LIST

I certify that I caused a copy of the above document to be served upon the aforementioned counsel via the Court's CM/ECF System on March 13, 2017.

I certify that all such counsel are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

I declare that I am a member of the bar of this Court, and that this certificate was executed on March 13, 2017 at Woodland Hills, California.

*/s/William K. Hanagami*
William K. Hanagami

SERVICE LIST

U.S., ex rel. Swoben v. Scan Health Plan, et al.

| | |
|---|---|
| Daniel Meron (daniel.meron@lw.com)<br>David Schindler (david.schindler@lw.com) | Attorneys for United defendants, Pacificare defendants, and Health Net |
| Jessica L. Ellsworth (jessica.ellsworth@hoganlovells.com)<br>Emily M. Lyons (emily.lyons@hoganlovells.com)<br>Paul Benedict Salvaty (paul.salvaty@hoganlovells.com)<br>David W. Skaar (david.skaar@hoganlovells.com)<br>Michael C. Theis (michael.theis@hoganlovells.com) | Attorneys for HealthCare Partners defendants |
| Beth A. Coombs (bcoombs@gibsondunn.com)<br>Geoffrey Sigler (gsigler@gibsondunn.com) | Attorneys for Aetna |
| James A. Bowman (jbowman@omm.com)<br>David M. Deaton (ddeaton@omm.com) | Attorneys for Wellpoint |
| John E. Lee (john.lee2@usdoj.gov)<br>Donald W. Yoo (donald.yoo@usdoj.gov) | Attorneys for United States of America |
| Abram J. Zinberg (abramzinberg@gmail.com) | Co-Counsel for James M. Swoben |

03-13-2017