CHAD A. READLER
Acting Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
LINDA A. KONTOS
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        E-mail:  carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        E-mail:  kathleen.lynch@usdoj.gov
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. JAMES M. SWOBEN,<br><br>Plaintiffs,<br><br>v.<br><br>SECURE HORIZONS, a business entity, form unknown, *et al*.,<br><br>Defendants. | No. CV 09-5013 JFW (JEMx)<br><br>UNITED STATES' COMPLAINT-IN-PARTIAL-INTERVENTION AND DEMAND FOR JURY TRIAL |

1    This is a civil fraud action brought by the United States of America ("United

2    States" or "Government") to recover treble damages and civil penalties under the False

3    Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common

4    law damages, for monies unlawfully obtained and/or retained from the federal Medicare

5    Program by Defendants UnitedHealth Group Inc.; UHC of California; United

6    HealthCare Services, Inc.; Optum, Inc.; OptumInsight, Inc.; UnitedHealthcare, Inc.; and

7    UHIC Holdings, Inc. ("UnitedHealth" or the "UnitedHealth Defendants").  Having filed

8    a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the United States alleges for

9    its complaint-in-partial-intervention (the "Government's Complaint" or "Complaint") as

10   follows:

11                              **INTRODUCTION**

12   1.     Millions of elderly and disabled individuals throughout the United States receive

13   their Medicare benefits through the Medicare Advantage Program.  A central,

14   distinguishing feature of the Medicare Advantage Program is the provision of Medicare

15   benefits by private health-insurance organizations.  Medicare beneficiaries enroll in

16   managed healthcare insurance plans called Medicare Advantage Plans ("MA Plans") that

17   are owned and operated by Medicare Advantage Organizations ("MA Organizations").

18   This case involves conduct by UnitedHealth – the nation's largest MA Organization – to

19   improperly obtain or avoid returning payments under the Medicare Advantage Program

20   that it was not entitled to receive.

21   2.     The Centers for Medicare & Medicaid Services ("CMS") pays each MA

22   Organization a fixed monthly payment for each Medicare beneficiary enrolled in its plan.

23   CMS adjusts these payments for various "risk" factors that affect expected healthcare

24   expenditures, including the health status of each enrollee.  The adjustments are intended

25   to ensure that MA Organizations are paid more for those enrollees expected to incur

26   higher healthcare costs and less for healthier enrollees expected to incur lower costs.

27   3.     To obtain payments based on adjustments for health status, MA Organizations

28   submit diagnosis codes to CMS for the beneficiaries in their MA Plans.  These diagnosis

codes are from the beneficiaries' medical encounters (*e.g.*, office visits and hospital stays).  Using these diagnosis codes, CMS calculates a risk score for each beneficiary.  The risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the following year.  In general, the more numerous the conditions, and the more severe the conditions, the higher the risk score and thus the greater the risk-adjusted payment made to the MA Organization.

4.     This payment model creates powerful incentives for MA Organizations to over-report diagnosis codes in order to exaggerate the expected healthcare costs for their enrollees.  In order to combat these incentives to report invalid diagnoses and protect CMS from making erroneous payments to MA Organizations, CMS requires that submitted diagnoses be supported and validated by the beneficiaries' medical records.  In addition, MA Organizations must expressly certify that the diagnosis codes they have provided are accurate and truthful.  42 C.F.R. § 422.504(l)(2).  MA Organizations must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

5.     UnitedHealth is the largest owner and operator of MA Organizations in the United States.  CMS pays billions of taxpayer dollars each year to UnitedHealth to provide managed healthcare to the Medicare beneficiaries enrolled in its MA Plans.  UnitedHealth's largest MA Organization is Defendant UHC of California (previously known as PacifiCare of California).

6.     One of the largest providers of services to UnitedHealth beneficiaries in California was HealthCare Partners ("HCP"), a large provider group that included HealthCare Partners Medical Group, Inc. (now known as DaVita Medical Group California, P.C., a California professional corporation located in El Segundo, California), HealthCare Partners, LLC (now known as DaVita Medical Management, LLC, a managed healthcare company located in El Segundo, California) and their various predecessors and affiliates.

3

7.     Pursuant to their contractual arrangement, UnitedHealth paid HCP a percentage share of the payments that UnitedHealth received from the Medicare Program for the beneficiaries under HCP's care.  Accordingly, UnitedHealth incentivized HCP to increase the payments – including risk adjustment payments – which UnitedHealth received from the Medicare Program for these beneficiaries.

8.     Since at least 2005, UnitedHealth has engaged in various activities to increase the risk adjustment payments it received from CMS.  This Complaint concerns UnitedHealth's funding of the cost of medical record reviews (commonly called "chart reviews") for HCP's patients enrolled in UnitedHealth's MA Plans either by paying a coding vendor, The Coding Source ("TCS"), to perform these reviews or paying HCP to perform these reviews.  This Complaint also concerns UnitedHealth's other involvement in and knowledge of HCP's chart reviews, including, but not limited to, its conception and direction of these chart reviews, which identified information leading to increased government payments (*i.e.*, additional diagnosis codes not previously submitted to CMS) while systematically ignoring information that would have led to decreased payments (*i.e.*, information about submitted diagnosis codes not supported and validated by the medical records).  By failing to "look both ways," UnitedHealth improperly generated and reported skewed data artificially inflating beneficiaries' risk scores, avoided negative payment adjustments, and retained payments to which it was not entitled.  Indeed, in the one year that HCP compared the results of the chart reviews with the provider-reported codes, it confirmed that at least 1,800 diagnosis codes were not supported by the medical records.

9.     By failing to "look both ways" and causing and/or conspiring with HCP to fail to "look both ways," UnitedHealth violated the FCA.  UnitedHealth knowingly presented, caused to be presented or conspired to present false or fraudulent claims to the Medicare Program or conspired to get false or fraudulent claims allowed or paid by the Medicare Program; knowingly made or used, caused to be made or used, or conspired to make or use false records or statements material to these false or fraudulent claims and to

obligations to pay monies to the Medicare Program; knowingly concealed or conspired to conceal obligations to pay monies owed to the Medicare Program; and knowingly and improperly avoided or decreased or conspired to avoid or decrease obligations to pay monies owed to the Medicare Program.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.  The Court has subject matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732 (a)-(b) and supplemental jurisdiction to entertain the common law and equitable claims for relief under 28 U.S.C. § 1367(a).

11.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in the Central District of California.

12.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or all of the Defendants are subject to the Court's personal jurisdiction under the FCA.

## PARTIES

### I.     Plaintiffs

13.     Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, CMS.  At all times relevant to the Government's Complaint, CMS administered and supervised the Medicare Program and made risk adjustment payments to MA Organizations, including UnitedHealth and its affiliates, under Parts C and D of the Program.  The United States filed its notice of partial intervention in this action on March 24, 2017.

14.     The *qui tam* plaintiff ("Relator") is James M. Swoben, a resident and citizen of the United States, the State of California, and of this District.  Relator originally filed this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730 (b)(1).

## II.     Defendants

15.     Defendant UnitedHealth Group Inc. ("UHG") is a publicly traded Delaware corporation.  It is the parent company for all other UnitedHealth Defendants in this action.  UHG, the other UnitedHealth Defendants, and their affiliates have offices in various locations throughout the United States, including in the Central District of California.  UHG's healthcare insurance products, including those under Parts C and D of the Medicare Program, are offered by, and UHG's MA Plans are managed by, various entities that are UHG's direct or indirect subsidiaries, including, but not limited to, the other UnitedHealth Defendants identified below. UHG controls all of these entities.

16.     Defendant UHC of California (formerly PacifiCare of California) is a California corporation, a direct subsidiary of Defendant UnitedHealth Care Services, Inc., and an indirect subsidiary of UHG.  Defendant UHC of California does business using the following names:  PacifiCare, PacifiCare of California, Secure Horizons, and UnitedHealthcare of California.  As previously alleged above, Defendant UHC of California is United's MA Plan in California.  Its offices are located in Cypress, California.

17.     Defendant United HealthCare Services, Inc. is a Minnesota corporation, the immediate parent of Defendant UHC of California, and a direct or indirect subsidiary of Defendant UHG.  Defendant United HealthCare Services, Inc. is also the successor to PacifiCare Health Systems, LLC and PacifiCare Health Plan Administrators, Inc., which were the direct or indirect parents of PacifiCare of California (the predecessor to UHC of California).

18.    Defendants Optum, Inc. and OptumInsight, Inc. (collectively "Optum") are Delaware corporations.  Optum is a direct or indirect subsidiary of Defendant UHG. Optum and its predecessor, Ingenix, Inc., were involved in the chart reviews.  Optum and Ingenix also were the entities that submitted risk adjustment data to the Medicare Program and shared the responsibility with other UnitedHealth entities for reporting invalid diagnoses to the Medicare Program and returning the overpayments to the Medicare Program associated with the invalid diagnoses.

19.    Defendant UnitedHealthcare, Inc. is a Delaware corporation, a direct subsidiary of Defendant United HealthCare Services, Inc., and an indirect subsidiary of Defendant UHG.  Defendant UnitedHealthcare, Inc. oversaw and managed various aspects of UnitedHealth's MA Organizations and MA Plans including risk adjustment activities such as the submission of risk adjustment data and claims to the Medicare Program, although a significant amount of the actual day-to-day work was conducted by Defendants Optum, Inc. and OptumInsight, Inc. and their predecessors from offices in this District and elsewhere.

20.    Defendant UHIC Holdings, Inc. is a Delaware corporation, a direct subsidiary of Defendant United HealthCare Services, Inc., and an indirect subsidiary of Defendant UHG.

21.    In 2005, UnitedHealth acquired PacifiCare Health Systems ("PacifiCare") and PacifiCare's and its affiliates' MA Plans, including PacifiCare of California, PacifiCare of Arizona, PacifiCare of Colorado, PacifiCare of Nevada, PacifiCare of Oklahoma, PacifiCare of Oregon, PacifiCare of Texas and PacifiCare of Washington.  Both before and after the acquisition, PacifiCare of California and possibly other PacifiCare MA Plans referred to themselves or to their brand of MA Plans as Secure Horizons.  Since 2005, these PacifiCare plans have been indirect subsidiaries of and controlled by UHG. Sometime after the acquisition, these PacifiCare plans were re-named or re-branded as UnitedHealth plans or merged into other UnitedHealth plans.  For instance, in 2011,

1   PacifiCare of California became Defendant UHC of California.  The PacifiCare entities

2   and their successors are now direct or indirect subsidiaries of Defendant UHG.

3   22.      Before United's acquisition of PacifiCare, the PacifiCare employees with

4   responsibilities relating to the submission of risk adjustment data to Medicare and to

5   other risk adjustment-related activities worked at a PacifiCare office in Cypress,

6   California, within this District.  Sometime after the acquisition, UnitedHealth moved this

7   office to Santa Ana, California, within this District.  A substantial part of the events or

8   omissions relevant to this litigation occurred at these and other locations within this

9   District.

10                                    **THE LAW**

11         **I.      The False Claims Act**

12   23.      The FCA reflects Congress's objective to "enhance the Government's ability to

13   recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1

14   (1986), available at 1986 U.S.C.C.A.N. 5266.  First, a defendant violates the FCA when

15   it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment

16   or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for

17   money.  *Id.*, § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the

18   entity or person submitting the claim was not entitled to payment.

19   24.      Second, after the 2009 amendments to the FCA by the Fraud Enforcement

20   and Recovery Act of 2009 ("FERA"), Pub.L. 111-21 (May 20, 2009), a defendant

21   violates the FCA when it "knowingly makes, uses, or causes to be made or used, a

22   false record or statement material to a false or fraudulent claim."  31 U.S.C.

23   § 3729(a)(1)(B).  Prior to FERA, a defendant violated this provision of the FCA

24   when it "knowingly [made], use[d], or cause[d] to be made or used, a false record

25   or statement to get a false or fraudulent claim paid or approved by the

26   Government."

27   25.      Third, after FERA's enactment in May 2009, a defendant violates the FCA when

28   it "knowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G). Prior to FERA, this provision of the FCA, commonly referred to as the "reverse false claims act" provision of the statute, provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

26.     Fourth, after FERA's enactment in May 2009, a defendant violates the FCA by conspiring to commit a violation of sections 3729(a)(1)(A), (B) or (G).  31 U.S.C. § 3729(a)(1)(C).  Prior to FERA, a defendant violated the FCA by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid.

27.     Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements.  *Id*. § 3729(b)(1)(A).  Proof that the defendant had specific intent to defraud the Government is not required.  *Id*. § 3729(b)(1)(B).  Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he or it was entitled to the money that he or it sought from the Government.  S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286.  The terms "knowing" and "knowingly" used in this Complaint have the meaning ascribed to them by the FCA. Similarly, those terms and the terms "knowledge," "knows" and "knew" are used in this Complaint to have the same meaning.

28.     In 2009, Congress also amended the FCA to provide a definition of the term "obligation."  *See* FERA, Pub. L. 111-21, 123 Stat. 1617, 1621-25 (2009).  It defined the term to mean "an established duty, whether or not fixed, arising from an express or

implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Congress promulgated this definition to reflect its long-held view that an "obligation" under the FCA's reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay monies to the Government.  S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

29.    Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property."  *Id*. § 3729(b)(4).

30.    Under the FCA, the Government is entitled to recover three times the amount of damages which it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty of not less than $5,500 and not more than $11,000.

## II.    The Medicare Statute

31.    Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled.  42 U.S.C. § 1395c *et seq.*  Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

32.    Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system.  Under a FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service, such as a physician office visit or a hospital stay.  CMS then pays the providers directly for each service.

33.    Under Medicare Part C (the "Medicare Advantage Program"), Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in and receive managed health care services from MA Plans.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

34.     Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan).  For simplicity, in this Complaint, the Government refers to all MA and MAPD Plans as Medicare Advantage Plans or MA Plans.

35.     Medicare beneficiaries who enroll in an MA Plan are considered a member of and enrollee in that plan.  In this Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, *i.e*. individuals enrolled in MA plans.

36.     MA Organizations' obligations to the Medicare Program and the requirements for them to participate in the Program are set forth in CMS regulations and, each year, the MA Organizations agree in writing to comply with those regulations.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA Organizations must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, and Medicare Advantage operating instructions.

### III.    Medicare Parts C and D Risk Adjustment Payments

37.     Under Part C, the Medicare Program pays each MA Organization a predetermined monthly amount for each Medicare beneficiary in the plan.  This monthly payment is known as a "per-member, per-month" payment.  The capitated payment for each plan varies depending on various factors, including amounts set forth in the plan's bid submitted to CMS.  Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on demographic factors (*e.g*., gender, age) and health status.  By risk adjusting for health status, Congress required that more be paid for beneficiaries with higher risk scores than be paid for beneficiaries with lower risk scores. CMS currently employs a health-based risk adjustment model – known as the

Hierarchical Conditions Category ("HCC") model – that takes into account diagnoses from inpatient hospital stays, outpatient encounters, and physician office visits.

38.     The HCC model is prospective, meaning that it relies on diagnoses for certain medical conditions assigned to beneficiaries by their physicians in one year (often referred to as the "date of service" or "DOS" year) to set the payment for each beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, *i.e.*, categories of clinically-related medical diagnoses are grouped into each HCC.  *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment.  Between 2004 and 2013, the CMS-HCC model included 70 HCCs.  Starting in 2014, the CMS-HCC model included 79 HCCs.

39.     Under Medicare Part D, payments to MAPD Plans are also risk adjusted based on health status.  As with Part C, Part D employs a health-based risk adjustment model – known as the Rx Hierarchical Condition Categories ("RxHCC") model.  Like HCCs, RxHCCs are also groups of clinically-related medical diagnoses that are ranked by disease severity and the cost associated with pharmaceutical drugs used to treat them.

40.     The Government assigns a relative numerical value to each HCC and RxHCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category.  It determines the relative values based on the amounts that it paid to fee-for-service providers to treat these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program.  Higher relative values are assigned to HCCs and RxHCCs categories that have diagnoses with greater disease severity and greater costs associated with their treatment.

41.     As previously stated, the HCC and RxHCC risk adjustment models are prospective and a beneficiary's risk score for a particular payment year is determined by his or her medical conditions during the previous year (*i.e.*, the date of service year).

These medical conditions must be documented by a qualified healthcare provider (*e.g*., a doctor) in the beneficiary's medical record during the previous year.

42.     Each beneficiary's risk score is calculated anew for each payment year.  For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during face-to-face medical encounters during date of service year 2011.

43.     MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans.  Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.  In this Complaint, the United States refers to diagnosis codes reported by providers through any means as "provider-reported diagnoses."

44.     MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter; the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Medical encounters include physician office visits, hospital outpatient visits, and hospital inpatient stays.

### IV.     Legal Obligation to Submit Valid Risk Adjustment Data

45.     MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS *only* if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See*

13

2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

46.     Risk adjustment claims are true and risk adjustment payments are valid only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  All diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  If the medical record is ambiguous, it cannot be relied on for diagnosis information for risk adjustment payments.  *See* 2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

47.     CMS recognizes that risk adjusting based on health status creates a strong incentive for MA Organizations to report diagnoses that are not validated by the beneficiary's medical records or to not delete previously-submitted invalid diagnoses so that they can increase their payments.  Thus, CMS engages in a variety of program integrity activities, including audits of diagnoses submitted by MA Organizations, known as Risk Adjustment Data Validation ("RADV") audits.  To support these audits, MA Organizations and their providers are required, when requested, to provide medical records to validate the diagnoses that they submitted for risk adjustment payments.  *See* 42 C.F.R. § 422.310(e).

48.     In addition, MA Organizations must (i) establish and implement effective compliance programs to ensure the integrity of their payment data, 42 CFR § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R. § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the accuracy and truthfulness of the diagnosis data that they submit for risk adjustment payments, 42 C.F.R. § 422.504(*l*) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal

14

criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."  42 C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

### A. MA Organizations Must Have Effective Compliance Programs

49.   The implementation of an effective compliance program is a prerequisite to an MA Organization's obtaining and retaining payments under both Parts C and D of the Medicare Program.  *Id*. §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D).  One purpose of requiring a compliance program is to ensure that MA Organizations submit accurate and truthful information to CMS.  65 FR 40170-01 at 40264 (June 29, 2000).

50.   Specifically, each MA Organization must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R. § 423.504(b)(4)(vi) (Part D).  The compliance program "must, at a minimum, include [certain] core requirements," including (but not limited to):

(F)   Establishment and implementation of an effective system for routine monitoring and identification of compliance risks.  The system should include internal monitoring and audits and, as appropriate, external audits, to evaluate the MA organization['s], including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G)   Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements.

(1)  If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the

contract, it must conduct a timely, reasonable inquiry into that
conduct.

> (2) The MA organization must conduct appropriate corrective
> actions (for example, repayment of overpayments, disciplinary
> actions against responsible employees) in response to the potential
> violation referenced in paragraph (b)(4)(G)(1) of this section.

> (3) The MA organization should have procedures to voluntarily
> self-report potential fraud or misconduct related to the MA
> program to CMS or its designee.

51.    A compliance program is not effective unless the MA Organization devotes
adequate resources to the program.

52.    MA Organizations must ensure the validity of the diagnoses they submit.  Among
other things, MA Organizations are responsible for deleting RAPS data submissions if
the diagnoses that they submitted are invalid.  Deletion of invalid diagnoses allows CMS
to recalculate the beneficiaries' risk scores and ensure that the Medicare Program does
not make improper risk adjustment payments to MA Organizations or that the Program
recovers improper payments that were already made.

53.    An MA Organization "maintains ultimate responsibility for adhering to and
otherwise fully complying with all terms and conditions of its contract with CMS,"
regardless of any relationship it may have with a downstream or related entity.  42 CFR
§ 422.504.  Thus, an MA Organization cannot delegate away its ultimate responsibility
for its compliance obligations.

54.    The final deadline for RAPS data submissions is generally four to six weeks after
the end of the payment year at issue.  For example, for the 2012 payment year, MA
Organizations could submit diagnosis codes relating to 2011 date of service medical
encounters until February 15, 2013.

55.    The final deadline is only a submission deadline; it does not pertain to deleting
invalid diagnoses in order to withdraw them.  *See* 42 C.F.R. § 422.310(g)(2)(ii)

(codifying pre-existing process permitting, after the final deadline, corrections to previously-submitted risk adjustment data).  Accordingly, MA Organizations can delete invalid diagnoses both before the deadline for RAPS data submissions for a payment year (known as "open-period deletes") and after the deadline for RAPS data submissions for a payment year (known as "closed-period deletes").

56.     Because the final submission deadline is after the completion of the payment year, monthly payments made during the payment year are interim payments.  After the final submission deadline (February 15, 2013 in the example given above), CMS determines if any adjustments to these interim monthly payments are necessary based on all diagnoses submitted for each beneficiary up until the final submission deadline (excluding those diagnoses that were deleted prior to the deadline) and re-calculates each beneficiary's risk score for the payment year to determine if it has changed and whether a plus or minus adjustment to the payment for the beneficiary is necessary.  If the beneficiary's risk score is higher because of the submission of additional diagnoses for that beneficiary, CMS makes a final reconciliation payment of any additional payment owed to the plan for that beneficiary for that payment year.  Conversely, if the beneficiary's risk score is lower because of the deletion of diagnoses for that beneficiary prior to the final submission deadline, CMS recovers the funds associated with the deleted diagnoses as part of this final reconciliation payment process.

### B. MA Organizations Must Attest to the Validity of Their Data

57.     After the final submission deadline but before their receipt of the final reconciliation payments, MA Organizations must attest to the validity of their risk adjustment data, including diagnoses, in a Risk Adjustment Attestation submitted to CMS.  Specifically, the chief executive officer, chief financial officer, or an individual delegated with authority to sign on behalf of one of these officers, and who reports directly to such officer, must certify that the risk adjustment data that the MA Organization submitted to CMS was accurate, complete, and truthful.

58.     An MA Organization must request payment on a document that contains this Attestation and the submission of this Attestation to CMS is a condition of receiving Risk Adjustment payments.

59.     The Part D regulations include a similar attestation for risk adjustment data, including diagnoses, submitted for risk adjustment payments under the prescription drug program.  Under the applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R. § 423.505(k).

60.     Every year, each MA Organization agrees that:

> [a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments. . . .
>
> 2.  Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.  The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS. If such risk adjustment data are generated by a related entity, contractor, or subcontractor must also attest to (based on best knowledge, information, and belief, as of the date

specified on the attestation form) the accuracy, completeness, and truthfulness of the data. [422.504(l).]

61.     MA Organizations have an obligation to acquire knowledge, information and belief about their risk adjustment data, including diagnoses, in order to both submit such data and attest to the accuracy and truthfulness of the data.  Long ago, CMS put MA Organizations on notice that they were "responsible for making *good faith efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care Manual, Chapter 7, at § 111.7.  When MA Organizations fail to act in good faith and turn a blind eye to their submission of inaccurate or untruthful data, their Risk Adjustment Attestations are false.

## THE FACTS

62.     Since at least 2005, UnitedHealth knew that many diagnosis codes that it submitted to the Medicare Program for risk adjustment were not supported and validated by the medical records of its enrolled beneficiaries.  UnitedHealth also knew that it was obligated to identify and delete these unsupported and invalid diagnosis codes.  Nonetheless, UnitedHealth turned a blind eye and funded and encouraged one-sided chart reviews of HCP's patients enrolled in UnitedHealth's MA Plans.  As a result, UnitedHealth knowingly avoided identifying invalid and unsupported diagnosis codes and wrongfully retained the risk adjustment payments associated with those codes.

### I.     UnitedHealth Knew Many Provider-Reported Diagnoses Were Invalid

63.     Since at least 2005, UnitedHealth knew that many provider-reported diagnoses submitted to the Medicare Program for risk adjustment payments were not supported by the beneficiaries' medical records and were invalid.

64.     In 2005, as part of its acquisition of PacifiCare, UnitedHealth retained PacifiCare employees who knew the requirements for submission of valid diagnosis codes, the

obligation to delete invalid codes, and the various problems relating to the invalidity of provider-reported diagnoses.

65.     For example, Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were all former PacifiCare employees knowledgeable about risk adjustment.  Dumcum had been PacifiCare's Chief Financial Officer and became UnitedHealth's Vice President of Finance.  Will had been a Principal Analyst at PacifiCare who designed risk adjustment programs and joined UnitedHealth as the Program Manager for UnitedHealth's national Chart Review Program.  Holt had been a Project Manager for Network Management Operations at PacifiCare and became the Manager of UnitedHealth's Provider Outreach-Risk Adjustment Program.  Leal had been an Executive Director of Provider Training and Development for PacifiCare and became UnitedHealth's Regional Vice President for Market Consultation.

66.     The former PacifiCare employees retained by UnitedHealth knew that providers reported diagnosis codes that were inconsistent with the information in their patients' medical records.  According to Dumcum, he and others at PacifiCare knew "in Medicare Advantage that the claims did not always match the medical record documentation.  So … we were concerned that it should be a place that we try to improve, that we try to educate and try to identify things to make that better."

67.     In addition, Will, Holt, and other former PacifiCare employees were aware of common diagnosis coding errors made by providers.  They learned of these errors through reports from PacifiCare employees working in the field with physicians, reports of physician-coding trends, and reports from PacifiCare-employed certified coders.  For example, a June 2003 presentation by Will, Holt, and other PacifiCare employees identified diabetes as a medical condition that was often miscoded.

68.     Moreover, the former PacifiCare employees were aware of the obligation to delete or withdraw invalid diagnoses that had been submitted for risk adjustment payments.  In April 2005, Holt participated in a "CMS data validation call" in which CMS explained that it expected MA Plans to correct invalid diagnoses submitted to Medicare for risk

20

adjustment payments.  Holt reported this to Will and suggested creating a spreadsheet to give providers to inform PacifiCare of invalid diagnoses and allow PacifiCare to delete them.  As part of this discussion, Leal explained to Will that, if provider groups "during their chart audits find that physicians have documented rule-out or history-of but coded as if the member had [the medical condition,] they want to be able to fix it so when we get audited again by CMS it is fixed."  Leal further stated that "[o]bviously, as issues are identified there will need to be education to physician[s] on changing their practice of coding incorrectly (as you remember Dr. Norman mentioned habits doctors have, that we will need to break)."

69.    Will, however, resisted the suggestion of establishing a process for providers to inform PacifiCare of invalid diagnoses.  In response to this resistance, Holt pushed back, insisting that provider groups "need something 'standardized and formalized' so they know what fields to report if and when they find any obvious discrepancies" and that CMS "was very firm that we need to be doing this."  Despite these warnings from Holt and Leal, until approximately 2013, UnitedHealth did not give providers such as HCP a standardized process to delete or withdraw invalid diagnoses based on the results of their chart reviews.

70.    In 2005, CMS conducted a data validation audit of diagnoses submitted by PacifiCare for 2003 date of service medical encounters.  The audit showed that approximately 30 percent of the provider-reported diagnoses were invalid.  From the audit results, PacifiCare learned that providers were reporting diagnosis codes that were unsupported, were from unacceptable sources (*e.g.*, laboratory results), and reflected non-current medical conditions.

71.    After UnitedHealth's acquisition of PacifiCare, the former PacifiCare employees began educating others at UnitedHealth about risk adjustment.  In particular, Dumcum made formal presentations to various UnitedHealth employees, including senior executives.  Dumcum gave a series of presentations where he explained to UnitedHealth employees that "[p]rovider coding is highly inaccurate and incomplete" and that "more

than 30% of coded conditions are not supported by CMS validation findings."
UnitedHealth's senior management such as Jerry Knutson, UnitedHealth Medicare &
Retirement's Chief Financial Officer from 2003 to 2009, participated in meetings in
which Dumcum made these presentations.

72.     In addition to the knowledge obtained from PacifiCare employees, UnitedHealth's
own data analysis revealed and confirmed problems with provider-reported diagnoses,
especially for capitated providers such as HCP.  UnitedHealth tracked the risk scores for
Medicare beneficiaries cared for by its providers and saw increases that were
significantly above the norm.  UnitedHealth generated reports that identified the
providers with abnormally high average risk scores.  These reports also identified
specific medical conditions that were reported by the providers at rates significantly
above average.  In September 2006, Will, Holt, Leal and others amassed a list of
providers that were outliers (*i.e.*, providers that reported codes 300 percent above the
norm).  This information made them "question the validity" of these providers' codes.
HCP was one of the providers on this list.

73.     UnitedHealth also knew that a significant percentage of provider-reported
diagnoses were invalid based on RADV (Risk Adjustment Data Validation) audits
performed by CMS and similar internal audits or reviews that UnitedHealth performed to
validate provider-reported diagnoses.  For example, one such audit was performed on
diagnoses submitted for 2004 date of service medical encounters (*e.g.*, physician office
visits) that mapped to 1,231 HCCs.  The results of this audit were reported in a
September 21, 2007 Risk Adjustment Programs presentation made by Dumcum to other
employees at UnitedHealth.  He reported that 32 percent of the HCCs were "Not Found,"
(*i.e.*, there was no medical record support for the diagnoses mapping to these HCCs).  In
the same presentation, Dumcum also reported on an audit of diagnoses submitted for
2005 date of service medical encounters that mapped to 1,160 HCCs.  He reported that,
as of the date of the presentation, 18 percent of the HCCs were "NOT supported" and
another 8 percent were most likely not supported.

74.   In 2006, Will, Dumcum, Holt, Leal and others participated in discussions about conducting an internal data validation ("IDV") program focused on the validity of provider-reported diagnoses.  The purpose of the IDV program was to determine if the physicians' medical records supported the diagnosis codes that they reported to UnitedHealth.

75.   In January 2007, Dumcum told others at UnitedHealth that UnitedHealth had to improve the validation of provider-reported diagnosis codes.

76.   In approximately 2007 and 2008, UnitedHealth implemented the IDV program. The program focused on capitated physicians in California and three other states who reported more than three times the number of diagnoses than the average.  The program was very small in scope, but the results confirmed that providers, including HCP, had reported invalid diagnoses.

77.   Accordingly, by at least 2005, UnitedHealth knew from the former PacifiCare employees that at least 30 percent of provider-reported diagnoses were not supported by the beneficiaries' medical records and, by at least 2008, UnitedHealth's own IDV results confirmed this problem with provider-reported diagnoses.  In particular, the prevalence of outlier reports and IDV results further made UnitedHealth aware of problems with the validity of the diagnoses reported by HCP.

78.   UnitedHealth knew that the validity of provider-reported diagnosis codes was a compliance risk.  In fact, in September 2008, one of UnitedHealth's own actuarial consulting subsidiaries, Reden & Anders, created a presentation that identified unsupported diagnosis codes submitted to CMS as a "Potential Compliance Risk Area." The presentation warned that "[t]here is no such thing as minimally compliant."

79.   Furthermore, during 2009, HHS's Office of Inspector General ("OIG") performed an audit of the risk adjustment data that United's California MA Plan, then called PacifiCare of California, submitted for payment year 2007 and, in 2010, the OIG sent UnitedHealth's CEO a draft report concluding that the diagnoses for half the beneficiaries in the audit were invalid and that PacifiCare of California practices were

not effective for ensuring that the diagnoses it submitted to CMS complied with CMS requirements.  After consideration of UnitedHealth's responses to the draft audit report, the OIG issued a final report concluding that the health risk scores of 45 percent of the beneficiaries in the audit were invalid because the diagnoses were not supported by the beneficiaries' medical records.  In both the draft and final reports, the OIG provided examples of unsupported diagnoses.

## II.     UnitedHealth Knew It Had to Identify and Delete Invalid Diagnoses

80.     Dumcum, Holt, Will and others all knew at least since their employment at PacifiCare that MA Organizations are not entitled to payment for risk adjustment claims based on diagnosis codes that were unsupported by the beneficiaries' medical records and that CMS expected health plans to delete unsupported diagnosis codes that were submitted to the Medicare Program for payment.

81.     The PacifiCare employees brought their knowledge that health plans were not entitled to payment for invalid diagnosis codes to UnitedHealth after the acquisition, and continued to build on this knowledge post-acquisition.  In August 2006, Will and Holt received information about CMS' RADV audits, which confirmed that CMS would invalidate diagnosis codes submitted to the Medicare Program that were not substantiated by a supporting medical record.

82.     Additional examples of this knowledge include:

- A January 2008 UnitedHealth presentation entitled "CMS-HCC Risk Adjustment Training Module" created for provider outreach, which recognized that it is the accuracy of medical record documentation and coding that supports entitlement to risk adjusted payments from the Medicare Program. The presentation recognized that accurate medical record documentation is key to accurate risk adjustment payments and necessary to validate payments.
- June 2008 emails in which UnitedHealth employees Patty Brennan and Karen Wagor discussed diagnosis coding.  In those emails, both UnitedHealth employees recognized that UnitedHealth was not entitled to payment based on

diagnoses that were not validated by beneficiaries' medical records and that
UnitedHealth risked having to return money to the Medicare Program for risk
adjustment payments based on invalid diagnoses.

- Similarly, in 2009, UnitedHealth employee Carol Thompson acknowledged
  that CMS required supporting medical records for all claims submitted for risk
  payments and that invalid data submitted by MA Organizations exposed
  UnitedHealth to FCA liability.

83.    In addition, a UnitedHealth presentation from November 2009 entitled "Audit
Management Overview" reflects UnitedHealth's knowledge that it was legally required
to have an effective compliance program and that "[i]n order to have an effective
Compliance Program, an organization must have a robust internal monitoring and
auditing process in place."

84.    In fact, as part of its compliance obligations, UnitedHealth had, since at least
2008, required certain provider groups to submit attestations to it that certified that the
diagnoses that they reported to UnitedHealth were valid and met CMS's requirements.
UnitedHealth sent notices to these providers describing these "**CMS DATA
ACCEPTANCE GUIDELINES**."  (Emphasis in the original).  These notices stated that
**"[a]ll diagnoses must be documented at the time of the patient encounter or after
receipt and confirmation of the diagnosis (*i.e.* Lab or Radiology report) and must
be documented in the medical record**," and **"[o]nly report diagnosis codes that can
be supported by the documentation in the medical record**," and **"[a]ll diagnosis
codes should be valid** . . . ."  These notices were sent to financially-incentivized
capitated providers that reported diagnoses to UnitedHealth through a web-based portal
referred to as the Alternative Submission Method.

85.    In 2010, Holt and Leal were a part of an email chain discussing California
provider groups and risk adjustment data validation.  In California, there was an industry
group called the Industry Collaborative Effort ("ICE"), which included provider groups
and MA Organizations such as UnitedHealth, and Holt and Leal were involved in ICE

and its Risk Adjustment Data Acquisition & Reporting ("RADAR") team. Based on this involvement (and possibly other sources), Holt noted that California provider groups are "acutely aware of the importance of data validation" and that risk adjustment data validation was "a subject discussed frequently at the ICE meetings." Leal stated that all provider groups in California understand the importance of CMS' RADV audits.

86.     UnitedHealth was also aware from audit work performed for it by its public accounting firm that chart reviews that "looked both ways" were the only way to achieve a full and complete picture of a beneficiary's health status and that UnitedHealth was obligated to delete or withdraw invalid provider-reported diagnoses.

### III.     UnitedHealth Funding of HCP's One-Sided Chart Reviews

87.     At all times relevant, HCP and its employed and affiliated physicians and other healthcare professionals reported diagnoses to UnitedHealth, which then submitted the diagnoses for payment to CMS.

88.     In or about 2005, UnitedHealth contracted with a vendor, TCS (The Coding Source), to perform retrospective chart reviews of capitated provider groups in California. In approximately 2012, TCS became Altegra Health and references hereinafter to TCS include Altegra.

89.     UnitedHealth knew that TCS's retrospective chart reviews were blind. In other words, the coders were not aware of the diagnosis codes reported by the providers. Instead, the coders reviewed the medical records and identified all medical conditions that the beneficiaries had and listed all diagnosis codes for these conditions. Accordingly, UnitedHealth knew that the results of these blind reviews showed both (i) under-reporting, *i.e.*, diagnoses that the providers did not report, and (ii) over-reporting, diagnoses that were reported by the providers but not validated by their medical records, *i.e.*, invalid diagnoses.

90.     Despite this knowledge, UnitedHealth knowingly avoided "looking both ways" at the results of the chart reviews. Although UnitedHealth used the chart reviews to identify and submit diagnoses that the provider had not reported (which resulted in

additional payments from CMS), UnitedHealth knowingly and improperly avoided comparing the diagnosis codes previously reported by the provider and submitted to Medicare for payments with the results of the coders' chart reviews in order to identify those provider-reported codes that were not supported by the beneficiaries' medical records (which would have resulted in decreased payments from CMS).  UnitedHealth should and could have performed this comparison and subsequently reported the invalid diagnosis codes to the Medicare Program.  If UnitedHealth had done so, the Medicare Program would have recovered from UnitedHealth the risk adjustment payments based on these invalid codes.

91.     By failing to "look both ways" and causing and/or conspiring with HCP to fail to "look both ways" at the results of the chart reviews, UnitedHealth violated various laws, regulations, and other requirements meant to combat the powerful incentive for MA Organizations and their incentivized capitated providers such as HCP to exaggerate beneficiaries' risk scores in order to obtain additional payments from the Medicare Program.

92.     In or about 2006, UnitedHealth funded the entire cost of chart reviews conducted by TCS of UnitedHealth beneficiaries who received healthcare from HCP in Los Angeles and other areas in Southern California.

93.     In or about 2007, UnitedHealth funded half the cost of chart reviews by TCS of UnitedHealth beneficiaries who received healthcare from HCP.  At this time, UnitedHealth contracted directly with TCS and invoiced HCP its share of these costs.

94.     In 2007, UnitedHealth sent HCP the results of the chart reviews for medical encounters that occurred in 2005 and 2006 (*i.e.*, encounters with 2005 and 2006 dates of service).  UnitedHealth also showed HCP the Return on Investment ("ROI") from the submission of additional diagnosis codes to Medicare based on chart reviews for UnitedHealth beneficiaries.  The ROI analysis for HCP's practice group in the "South Bay" area showed a 30.5:1 ROI based on the review of 2,224 charts, which resulted in approximately $2 million in additional revenue.  The ROI analysis for another HCP

practice group showed a 28.7:1 ROI based on the review of 2,514 charts, which resulted in approximately another $2 million in additional revenue.  The ROI analysis for a third HCP group showed a 21.8:1 ROI based on the review of 2,431 charts, which resulted in approximately $1.6 million in additional revenue.

95.    In June 2007, HCP contracted directly with TCS for chart reviews through a Coding Services Agreement (hereinafter "Coding Agreement").  Although HCP directly contracted with TCS, UnitedHealth continued to fund a portion of the cost of HCP's chart reviews.  HCP and UnitedHealth agreed that HCP would self-conduct the chart review with cost sharing from UnitedHealth, an arrangement sometimes referred to by UnitedHealth as a "provider self-conducted with cost sharing" chart review.

96.    In October 2007, Ted Halkias, Senior Vice President Finance at HCP, wrote to Jeff Toda at UnitedHealth memorializing an agreement between HCP and UnitedHealth regarding the TCS chart reviews.  The letter stated that UnitedHealth "agrees to reimburse HCP for 50% of the total expense incurred related to this initiative for [TCS] chart audits performed on behalf of PCPs [primary care physicians] and 17% of total expense incurred related to this initiative for [TCS] chart audits performed on behalf of specialists, based on a cost per chart of $30.00."

97.    As a result of this cost-sharing agreement, on May 26, 2008, HCP invoiced UnitedHealth a total of $149,227.55 for the chart reviews performed by TCS from August 2007 through December 2007.  This included 9,543 primary care physician chart reviews at 50 percent funding and 229 specialist chart reviews at 17 percent funding.

98.    In 2008, Sue Erickson, a HCP employee, requested funding from Holt at UnitedHealth for TCS to perform specialist chart reviews and clinical chart reviews (to identify new codes for primary care physicians to assess and diagnose).  UnitedHealth agreed to fund the proposed chart reviews at 17 percent.

99.    On August 14, 2008, three years after Will and Leal discussed and rejected the idea of giving providers like HCP a retraction spreadsheet for informing UnitedHealth about invalid diagnosis codes that they previously reported to UnitedHealth, *see*

Paragraphs 68-69, HCP employee Nallu Vijayakumar sent HCP employee Sue Erickson an email regarding an ICE meeting Vijayakumar attended that morning.  Vijayakumar reported that the issue of unsupported and invalid diagnosis codes was discussed at the meeting.  Vijayakumar stated that a "[c]ouple of IPA's [*i.e.* independent physician associations such as HCP] didn't know how to retract invalid codes (the process/what form/sheet to use) that were already submitted to health plans.  So the health plans (Blue Shield/Secure Horizons/SCAN) said that they will post a spread sheet with the data needed, that the IPA's/Groups can use to submit retractions.  Once the spreadsheets are posted, a broadcast email will be sent out.  The topic will be revisited again next month to see if all the health plans can agree on using the same spreadsheet (with the same needed data)."

100.   The very next day, on August 15, 2008, HCP modified its Coding Agreement with TCS based on its recognition that previously reported diagnoses codes were often unsupported by beneficiaries' medical records, and that previously submitted diagnoses codes should be validated during chart reviews.  The new scope of work ("SOW") stated that the "[c]lient wishes to have TCS conduct a sample validation audit for appropriately 3,000 individual medical notes for its contracted group."  Despite this recognition, HCP only contemplated that this validation audit be conducted on a sample basis.  The sample validation audit required TCS to "review each medical record and determine if the diagnosis code previously submitted is able to be validated based on the documentation provided."

101.   The new SOW also stated that TCS would perform an abstraction focused audit to identify diagnosis codes as well as to identify and document some provider documentation and coding improvement opportunities.  The SOW stated that "[t]he audits done by TCS Coders are not intended to be an all-inclusive, comprehensive review of the documentation and coding practices of the Client or the Providers and as such, TCS is not expected nor will it deliver a report to Client that includes all documentation and coding errors, omissions, opportunities or areas for improvement

unless specifically requested by Client in writing."  The SOW, again, explicitly recognized the fact that provider coding inherently included errors and omissions.

102.    Two months later, the RADAR team, which included HCP, again addressed risk adjustment data validation requirements.  On October 9, 2008, Vijayakumar sent Erickson an email summarizing a RADAR team call.  Vijayakumar reported to Erickson that CMS informed them how MA Organizations were supposed to delete or withdraw invalid diagnoses.  Moreover, Vijayakumar told Erickson that CMS expects providers to conduct self-audits to validate the diagnoses that they report to MA Organizations, such as UnitedHealth, for submission to the Medicare Program.  Under "Best Practices," the summary states:  "Jose Fernandez [chair of RADAR committee] shared that CMS looks at the groups to do their own data validation audits and not just wait for CMS to do [its] chart/documentation audits."

103.    After this October 9, 2008, RADAR team call, HCP itself compared the results of TCS' reviews of medical records from HCP specialists with the codes the specialists had previously reported in order to determine whether the specialists' codes were supported by their own medical records.  The results of this review again highlighted the need to validate provider-reported diagnoses.  On January 29, 2009, Erickson asked Bettina Lau, Internal Consulting at HCP, to create a file identifying the diagnoses submitted by the specialists that TCS did not validate based on the beneficiaries' medical records.  In response, Lau provided Erickson with a spreadsheet that identified diagnosis codes "[s]ubmitted by the provider and TCS did not abstract it."  Lau identified over 1,800 diagnosis codes submitted by the providers that, based on TCS's reviews, were not supported by the beneficiaries' medical records.  For example,[1]

- For beneficiary A, HCP identified a diagnosis code that mapped to HCC 19 (Diabetes without Complication).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record

---

[1] The HICNs and additional information for the following examples will be provided to defendants under separate cover.

documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary B, HCP identified a diagnosis code that mapped to HCC 108 (Chronic Obstructive Pulmonary Disease).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary C, HCP identified a diagnosis code that mapped to HCC 37 (Bone/Joint/Muscle Infections/Necrosis).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary D, HCP identified a diagnosis code that mapped to HCC 37 (Bone/Joint/Muscle Infections/Necrosis).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary E, HCP identified a diagnosis code that mapped to HCC 25 (End-Stage Liver Disease).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary F, HCP identified a diagnosis code that mapped to HCC 108 (Chronic Obstructive Pulmonary Disease).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

- For beneficiary G, HCP identified a diagnosis code that mapped to HCC 111 (Aspiration and Specified Bacterial Pneumonias).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.  Also for beneficiary G, HCP identified a diagnosis code that mapped to HCC 108 (Chronic Obstructive Pulmonary Disease).  Based on the chart review results, this diagnosis code was unsupported and invalidated by HCP's medical record documentation and should have been deleted or withdrawn by UnitedHealth and the associated overpayment should have been repaid but was not.

104.   For the "2008 HCC program shared expenses," HCP invoiced UnitedHealth $63,776.35 for 10,744 primary care physician charts and 2,415 specialist charts coded by TCS.  HCP also invoiced UnitedHealth $90,950 for the clinical chart reviews (to identify new diagnosis codes for providers to assess and diagnose).

105.   UnitedHealth and HCP also knew from involvement in ICE and other sources that enrollees' medical records are the "source of truth" for establishing their entitlement to risk adjustment payments.  In 2010, the RADAR team issued a guidance document to providers entitled "Documentation Hints," which highlighted that Medicare guidelines require complete and accurate documentation of medical conditions in order to validate diagnoses and support entitlement to risk adjustment payments, that only diagnoses depicting documented medical conditions which required care or affected patient care are valid, and that diagnoses codes cannot be submitted "until [the provider] is sure the patient has the condition."  The RADAR Physician Education Work Group also issued a similar document called "Best Practices for Risk Adjustment," which advises that "ICD-9-CM coding requires documentation of the diagnosis in the medical record as well as evaluation and management.  Documentation should indicate how this diagnosis impacted this episode of care."  In addition, in 2012, ICE issued a Medical Record

Documentation Tips sheet which warned plans and providers not to code diagnoses that are probable, suspected, questionable, or "working diagnoses" and not to code diagnoses when medical records use "other similar terms indicating uncertainty."  This tips sheet also stated that providers and diagnosis coders must use codes reflecting "history of" when the patient had the medical condition but it no longer exists.  More recently, in 2013, ICE issued a "Documentation Newsletter" that repeated earlier advice and also cautioned that "[c]oding guidelines prohibit coders from making assumptions" regarding whether a diagnosis is or is not substantiated by a patient's medical record.  That is, the medical record must "clearly reflect" the medical condition.

106.    Until at least 2011, UnitedHealth paid part of the cost of HCP's chart reviews pursuant to a cost-sharing arrangement.  This arrangement included the review of thousands of medical records of beneficiaries in UnitedHealth's MA Plans.

107.    Until at least 2014, HCP continued to engage TCS to perform one-sided chart reviews.  UnitedHealth either had actual knowledge, deliberately ignored, or recklessly disregarded that HCP did so.

### IV.    UnitedHealth's Risk Adjustment Attestations

108.    UnitedHealth submitted a Risk Adjustment Attestation each year after the final risk adjustment submission deadline but before the final reconciliation payment.  UnitedHealth knew that it was required to submit a truthful Risk Adjustment Attestation to the Medicare Program.  UnitedHealth also believed that, with respect to executing the Attestation, it had a greater obligation to ensure the validity of the diagnoses submitted by incentivized providers, including capitated providers like HCP, because these providers had a financial incentive to over-report diagnoses.  Starting with the Attestation for payment year 2008 (if not earlier) and continuing forward, UnitedHealth even added to its Attestations a footnote which stated that they were "based on facts reasonably available or made available to [UnitedHealth] as of the date[s] of" the Attestations.  Facts reasonably available or made available to UnitedHealth included the negative results of the HCP one-sided chart reviews.

**FIRST CLAIM FOR RELIEF**

**False Claims Act:  Presentation of False or Fraudulent Claims**

**31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

109.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 – 108 above as though they are fully set forth herein.

110.   Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the Government in order to receive and retain risk adjustment payments from the Medicare Program.

111.   Defendants violated former 31 U.S.C. § 3729(a)(1) as follows:  Defendants knowingly presented, or caused to be presented, to the Government a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the Government in order to receive and retain risk adjustment payments from the Medicare Program.

112.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

**SECOND CLAIM FOR RELIEF**

**False Claims Act: Making or Using False Records or Statements**

**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

113.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 – 108 above as though they are fully set forth herein.

114.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk

34

1  Adjustment Attestation material to a false or fraudulent claim for risk adjustment
2  payments from the Medicare Program.

3  115.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants
4  knowingly made, used, or caused to be made or used, a false record or statement to get a
5  false or fraudulent claim paid or approved by the Government.  Specifically, Defendants
6  knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation
7  to get a false or fraudulent claim for risk adjustment payments paid or approved by the
8  Medicare Program.

9  116.   By virtue of the said false record or statement, the United States incurred damages
10 and therefore is entitled to multiple damages under the False Claims Act, plus a civil
11 penalty for each violation of the Act.

12           **THIRD CLAIM FOR RELIEF**

13           **False Claims Act:  Conspiracy**

14    **31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))**

15 117.   The United States repeats and re-alleges the allegations contained in Paragraphs 1
16 – 108 above as though they are fully set forth herein.

17 118.   Defendants violated 31 U.S.C. § 3729(a)(1)(C) as follows:  Defendants conspired
18 with HCP and possibly other providers to commit a violation of 31 U.S.C.
19 § 3729(a)(1)(A), (B), and/or (G), as those violations are specifically alleged in Claims I,
20 II, and IV of the Government's Complaint.

21 119.   Defendants violated former 31 U.S.C. § 3729(a)(3) as follows:  Defendants
22 conspired with HCP and possibly other providers to defraud the Government by getting
23 a false or fraudulent claim allowed or paid.  Specifically, Defendants conspired with
24 HCP and possibly other providers to defraud the Government by getting risk adjustment
25 payments from the Medicare Program based on a false or fraudulent claim for risk
26 adjustment payments and/or a false or fraudulent Risk Adjustment Attestation.

27
28

120.   By virtue of the said conspiracy, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF

### False Claims Act:  Reverse False Claims

### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

121.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 – 108 above as though they are fully set forth herein.

122.   Defendants violated 31 U.S.C. § 3729(a)(1)(G) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

123.   Defendants also violated 31 U.S.C. § 3729(a)(1)(G) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly concealed or improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

124.   Defendants violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

125.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### Restitution (Unjust Enrichment)

126.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 – 108 above as though they are fully set forth herein.

127.   Defendants have received money from the United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare risk adjustment payments based on invalid risk adjustment data.  In equity and good conscience, such money belongs to the United States and to the Medicare Program.

128.   The United States is entitled to recover such money from Defendants in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Payment by Mistake

129.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 – 108 above as though they are fully set forth herein.

130.   The United States paid money to Defendants as a result of a mistaken understanding.  Specifically, the United States paid Defendants claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

131.   As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in the amount to be determined at trial.

1

## **PRAYER**

2

   **WHEREFORE**, the United States requests that judgment be entered in its favor and

3

against Defendants as follows:

4

132.   On Claims I, II,  III, and IV (False Claims Act), against all Defendants jointly and

5

severally, for the amount of the United States' damages, trebled as required by law,

6

together with the maximum civil penalties allowed by law, costs, post-judgment interest,

7

and such other and further relief as the Court may deem appropriate;

8

133.   On Claim V (Restitution), against all Defendants jointly and severally, for an

9

amount equal to the monies that Defendants obtained from the United States without

10

right and by which Defendants have been unjustly enriched, plus costs, pre- and post-

11

judgment interest, and such other and further relief as the Court may deem appropriate;

12

and

13

134.   On Claim VI (Payment By Mistake), against Defendants for an amount equal to

14

the United States' damages, plus costs, pre- and post-judgment interest, and such other

15

and further relief as the Court may deem appropriate.

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

The United States of America hereby demands a trial by jury.

Dated:  May 1, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
Chief, Civil Division
DAVID K. BARRETT
Chief, Civil Fraud Section
LINDA A. KONTOS
Deputy Chief, Civil Fraud Section
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney


   /S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney

Attorneys for the United States of America