CHAD A. READLER
Acting Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
LINDA A. KONTOS
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JUSTIN DRAYCOTT
JESSICA KRIEG
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email:  carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; (Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. JAMES M. SWOBEN, <br><br> Plaintiffs, <br><br> v. <br><br> SECURE HORIZONS, a business entity, form unknown, *et al*., <br><br> Defendants. | No. CV 09-5013 JFW (JEMx) <br><br> UNITED STATES' OPPOSITION TO UNITED'S MOTION TO DISMISS UNITED STATES' COMPLAINT-IN-PARTIAL-INTERVENTION; EXHIBIT <br><br><br> DATE:  September 18, 2017 <br> TIME:  1:30 p.m. <br> COURT:  Hon. John F. Walter |

MEMORANDUM OF POINTS AND AUTHORITIES

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................... 1

II.   MOTION TO DISMISS STANDARD .......................................... 4

III.  ARGUMENT ........................................................................ 5

    A.    Law of the Case, Rule of Mandate, and *Stare Decisis* Preclude United From Challenging the Legal Sufficiency of the United States' Complaint  5

    B.    United's Arguments are Meritless ............................................  8

        1.    The Complaint Adequately Alleges "Knowledge" .................  8

        2.    The Complaint Adequately Alleges "Materiality" .................  14

        3.    The Reverse FCA Claims Were Not Waived ........................  18

        4.    Claims for Pre-2007 Violations Are Not Barred and the Complaint Relates Back to Conduct Alleged by Swoben in 2010 ..............  20

        5.    The Complaint Adequately Alleges the Defendants' Roles in Defrauding the Medicare Advantage Program .....................  23

IV.   CONCLUSION ................................................................... 25

i

# TABLE OF AUTHORITIES

**CASES**                                                                          PAGE(S)

*Alaimalo v. United States*,
   645 F.3d 1043 (2011) ............................................................... 6

*Babauta v. Babauta*,
   2013 WL 5430174 (Guam Aug. 20, 2013) ........................... 6, 8

*Branch v. Tunnel*,
   14 F.3d 449 (9th Cir. 1994), *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) .................... 5

*Carpenter v. Tahoe Reg. Planning Agency*,
   804 F. Supp. 1316 (D. Nev. 1992) ...................................... 19

*Chevron USA, Inc. v. Bronster*,
   363 F.3d 846 (9th Cir. 2004), *rev'd on other grounds,*
   *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 528 (2005) ............ 6

*City & County of San Francisco v. Tutor-Saliba Corp.*,
   2005 WL 645389 (N.D. Cal. Mar. 17, 2005) .................... 14

*City of Chicago v. Purdue Pharma L.P.*,
   211 F. Supp. 3d 1058 (N.D. Ill. 2016) ............................. 18

*DeSoto v. Yellow Freight Sys., Inc.*,
   957 F.2d 655 (9th Cir. 1992) .............................................. 5

*Disimone v. Browner*,
   121 F.3d 1262 (9th Cir. 1997) ........................................... 7

*Doe v. United States*,
   419 F.3d 1058 (9th Cir. 2005) ........................................... 5

*Ebeid ex rel. United States v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) .............................................. 5

*Hooper v. Lockheed Martin Corp.*,
   688 F.3d 1037 (9th Cir. 2012) ......................................... 13

*In re Deboer*,
   1999 WL 33486710 (Bankr. D. Idaho July 20, 1999) ........ 7

*In re Int'l Rectifier Corp. Sec. Litig.*,
   2008 WL 4555794 (C.D. Cal. May 23, 2008) .............. 13, 14

*In re Staff Mortgage & Investment Corp.*,
   625 F.2d 281 (9th Cir. 1980) .............................................. 7

*Jenkins v. McKeithen*,
   395 U.S. 411 (1969) ........................................................... 5

ii

*Kimble v. Marvel Entm't, LLC,*
__ U.S. __, 135 S. Ct. 2401 (2015) ............................................................. 7

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,*
507 U.S. 163 (1993) ...................................................................................... 4

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001), *overruled on other grounds, Galbraith v. County of
Santa Clara,* 307 F.3d 1119 (9th Cir. 2002) ............................................... 5

*Neder v. United States,*
527 U.S. 1 (1999) ........................................................................................ 16

*Nordstrom, Inc. v. Chubb & Son, Inc.,*
54 F.3d 1424 (9th Cir. 1995) ...................................................................... 14

*Sanchez v. Astrue,*
2012 WL 3704756 (E.D. Cal. Aug. 27, 2012) ....................................... 6, 8

*Secs. Investor Prot. Corp. v. Vigman,*
74 F.3d 932 (9th Cir. 1996) .......................................................................... 6

*Swartz v. KPMG LLP,*
476 F.3d 756 (9th Cir. 2007) ...................................................................... 24

*United States v. Bourseau,*
531 F.3d 1159 (9th Cir. 2008) .................................................................... 20

*United States v. Cote,*
51 F.3d 178 (9th Cir. 1996) .......................................................................... 6

*United States v. Educ. Mgmt. Corp.,*
871F. Supp. 2d 433 (W.D. Pa. 2012) ......................................................... 14

*United States v. Jingles,*
702 F.3d 494 (9th Cir. 2012) ........................................................................ 6

*United States v. Perez,*
2012 WL 3642849 (4th Cir. Aug. 24, 2002) ............................................... 6

*United States v. Ritchie,*
342 F.3d 903 (9th Cir. 2003) ........................................................................ 5

*United States v. Safran Group, S.A.,*
2017 WL 335197 (N.D. Cal. Jan. 19, 2017) ............................................. 25

*United States v. Science Applications Int'l Corp.,*
626 F.3d 1257 (D.C. Cir. 2010) .................................................................. 13

*United States v. Smith,*
389 F.3d 944 (9th Cir. 2004) ........................................................................ 6

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
501 F.3d 493 (6th Cir. 2007) ........................................................................ 9

*United States ex rel. Campie v. Gilead Scis., Inc.,*
   862 F.3d 890 (9th Cir. 2017) .......................................................................... 16

*United States ex rel. Dresser v. Qualium Corp.,*
   2016 WL 3880763 (N.D. Cal. July 18, 2016) ............................................ 15, 18

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
   352 F.3d 908 (4th Cir. 2003) ........................................................................... 9

*United States ex rel. Hendow v. Univ. of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) ........................................................................ 14

*United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.,*
   370 F. Supp. 2d 993 (N.D. Cal. 2005) ............................................................ 19

*United States ex rel. Hyatt v. Northrop Corp.,*
   91 F.3d 1211 (9th Cir. 1996) .......................................................................... 21

*United States ex rel. Kelly v. Serco, Inc.,*
   846 F.3d 325 (9th Cir. 2017) ..................................................................... 16, 20

*United States ex rel. Lee v. Corinthian Colls,*
   655 F.3d 984 (9th Cir. 2011) ...................................................................... 5, 24

*United States ex rel. Modglin v. DJO Global, Inc.,*
   114 F. Supp. 3d 993 (C.D. Cal. 2015(), *aff'd United States v. DJO Global, Inc.,*
   678 Fed. Appx. 594 (9th Cir. 2017) ................................................................ 12

*United States ex rel. Pecanic v. Sumitomo Electric Interconnect Prods,, Inc.,*
   2013 WL 774177 (S.D. Cal. Feb. 28, 2013) .................................................... 25

*United States ex rel. Poehling v. United Health Group,*
   No. 16-08697 (C.D. Cal.) ................................................................................ 11

*United States ex rel. Rigsby v. State Farm Fire & Cas. Co.,*
   794 F.3d 457 (5th Cir. 2015), *aff'd,* 137 S. Ct. 436 (2016) ......................... 8, 11, 13

*United States ex rel. Shemesh v. CA. Inc.,*
   89 F. Supp. 3d 36 (D.C. Cir. 2015) ................................................................. 13

*United States ex rel. Swoben v. United Healthcare Insurance Co.,*
   848 F.3d 1161 (9th Cir. 2016) ................................................................. *passim*

*United States ex rel. Wilkins v. United Health Grp.,*
   1659 F.3d 295 (3rd Cir. 2011) ......................................................................... 15

*United States ex rel. Zissler v. Regents of the Univ. of Minn.,*
   154 F.3d 870 (9th Cir. 1998) ............................................................................ 7

*Universal Health Services v. United States ex rel. Escobar,*
   __ U.S. __, 136 S. Ct. 1989 (2016) ........................................................ 3, 15, 17, 18

*Vanleeuween v. Keyuan Petrochemicals , Inc.,*
   2013 WL 2247394 (C.D. Cal. May 9, 2013) ...................................................... 7

*Veritas Operating Corp. v. Microsoft Corp.*,
  2008 WL 474248 (W.D. WWash. Fev. 4, 2008) ........................................ 19

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
  135 F.3d 658 (9th Cir. 1998) ..................................................................... 4

STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 78u-4(b)(2) ........................................................................ 14

31 U.S.C. §§ 3729-3733 ........................................................................... 1

31 U.S.C. § 3729(a)(1)(A) ................................................ 2, 8, 12, 14, 19

31 U.S.C. § 3729(a)(1)(B) ..................................................... 2, 8, 12, 19

31 U.S.C. § 3729(a)(1)(G) ............................................................. 2, 12, 18

31 U.S.C. § 3729(b)(1)(B) ....................................................................... 14

31 U.S.C. § 3730(b)(1) ............................................................................ 19

31 U.S.C. § 3731(b)(1) ...................................................................... 20, 21

31 U.S.C. § 3731(b)(2) ...................................................................... 20, 21

31 U.S.C. § 3731(c) ..................................................................... 19, 21, 22

42 C.F.R. § 422.310(d) ............................................................................. 4

42 C.F.R. § 422.503(b)(4)(vi) .............................................................. 2, 4

42 C.F.R. § 422.504 ............................................................................... 10

42 C.F.R. § 422.504(1) ........................................................ 4, 10, 14, 18

42 C.F.R. § 422.504(l)(2) ....................................................................... 10

42 C.F.R. § 422.505(1) ............................................................................ 2

Fed. R. Civ. P. 8 ............................................................................... 3, 10

Fed. R. Civ. P. 9(b) .................................................... 3, 5, 10, 20, 23

Fed. R. Civ. P. 12(b)(6) ................................................................ 3, 4, 10

# I.  <u>INTRODUCTION</u>

The United[1] defendants' arguments attacking the United States' Complaint-in-Partial-Intervention ("Complaint") are legally and factually meritless and their motion should be denied.  This case involves gaming of the Medicare Program by United, the nation's largest owner of Medicare Advantage Organizations ("MAOs").  The United States' Complaint adequately alleges that United violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, by deliberately ignoring or recklessly disregarding negative results of medical chart reviews and failing to withdraw previously submitted diagnosis codes that it knew were invalidated by those chart reviews.  In particular, the Complaint alleges that United conceived, designed, funded, and was otherwise responsible for chart reviews of Medicare beneficiaries who were enrolled in its California MAO, defendant UHC of California, and received services from a large California provider group called HealthCare Partners ("HCP").  Compl. ¶¶ 6, 8.  The Complaint further alleges that, after conducting these chart reviews, United submitted to the Centers for Medicare and Medicaid Services ("CMS") only "information leading to increased government payments (*i.e.*, additional diagnosis codes not previously submitted to CMS) while systematically ignoring information that would have led to decreased payments (*i.e.*, information about submitted diagnosis codes not supported and validated by the medical records)."  *Id.* ¶ 8.  By "knowingly" (as defined in the FCA) reporting only the positive results and ignoring the negative results from the very same chart reviews, the Complaint alleges that United unlawfully reported skewed data, artificially inflating the risk adjustment payments it sought and received from CMS.  *Id.*

The Complaint also adequately alleges that United knowingly submitted or presented, made, or used, or caused to be submitted, presented, made, or used, false Risk Adjustment Attestations certifying the validity of the diagnoses codes that United knew

---

[1] Defendants UnitedHealth Group Incorporated, UHC of California, United HealthCare Services, Inc., Optum, Inc., OptumInsight, Inc., UnitedHealthcare, Inc., and UHIC Holdings, Inc. are collectively referred to herein as "United."

had been invalidated by the chart reviews of HCP patients enrolled in defendant UHC of California. The Complaint alleges that the false Attestations were factually false claims under § 3729(a)(1)(A), Compl. ¶ 111, and express false statements under § 3729(a)(1)(B) and (G), *id.*, ¶¶ 114-115, 122, and 124.[2]

Notably, the Ninth Circuit has already ruled that substantially identical but much less detailed allegations against United are sufficient to assert a cognizable legal theory under the FCA. *United States ex rel. Swoben v. United Healthcare Insurance Company,* 848 F.3d 1161, 1176 (9th Cir. 2016). The Ninth Circuit's decision is now the law of this case. United's attempt to dismiss the Ninth Circuit's decision by characterizing it as merely a foray into a "policy discussion," United's Memo. at 1, must be rejected. The Ninth Circuit recognized United's clear legal obligation to exercise due diligence and implement an effective compliance program under 42 C.F.R. §§ 422.503(b)(4)(vi) and 422.505(l). 848 F.3d at 1168-69, 1174. This well-established obligation formed the underpinning of the Ninth Circuit's holding establishing for this case that United cannot turn a blind eye to information it knew about the invalidity of diagnostic data it submitted to obtain risk adjustment payments. As stated by the Ninth Circuit:

> If Medicare Advantage organizations acquire the codes identified by
> retrospective coders, compare them to the codes previously submitted to
> CMS, identifying both under- and over-reporting errors, but withhold
> information about the over-reporting errors from CMS, this would result in
> a false certification. The same is true when a Medicare Advantage
> organization undertakes comprehensive blind coding but then runs a
> unidirectional comparison with the previously submitted codes to review
> only under-reporting errors. . . . In the second example, where the

---

[2] The United States has also alleged that United violated § 3729(a)(1)(G) because it "concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government." Compl. ¶ 123. A false statement is not required under this portion of the statute. 31 U.S.C. § 3729(a)(1)(G) (second part). Thus, United's Attestation arguments do not reach this aspect of the United States' reverse false claims.

1  organization turns a blind eye to the over-reporting errors, it exhibits

2  reckless disregard and deliberate ignorance toward the truth or falsity of the

3  data submitted to CMS.

4  *Id*. at 1175-76.  The United States' FCA claims are based on United's turning "a blind

5  eye" to the negative results of its medical chart reviews, *i.e.*, the results showing what the

6  Ninth Circuit referred to as "over-reporting errors."  Accordingly, the Ninth Circuit's

7  decision, as the law of this case, establishes the viability of the United States' FCA

8  claims.  United should be precluded from re-litigating this issue.

9       The Ninth Circuit's decision in *Swoben* also establishes the sufficiency of the

10  Complaint's allegations under Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil

11  Procedure.  The Ninth Circuit already held that Swoben's then-proposed Fourth

12  Amended Complaint ("FAC") against United satisfied these rules.  *Id*. at 1181-82

13  (stating that the proposed FAC "offers more than broad allegations lacking supporting

14  detail and provides a strong factual basis" for FCA claims against United).  The United

15  States' Complaint provides much greater detail about United's unlawful conduct than

16  Swoben's proposed FAC.  The United States' Complaint therefore also satisfies Rules 8,

17  9(b), and 12(b)(6).  United is precluded from re-litigating this issue as well.

18       The Court should also disregard United's efforts to recast the Complaint's

19  allegations, its various mischaracterizations, and its focus on other extraneous or

20  irrelevant matters.  For example, contrary to United's assertion, the United States does

21  *not* allege that United's Attestations were false because they misrepresented that United

22  "had undertaken additional diligence efforts that, in fact, it had not undertaken" or that

23  its data was of a "higher standard of accuracy" than CMS' data.  United's Memo. at 7,

24  10.  This case is *not* about legally false certifications of compliance with conditions of

25  payment, regulatory due diligence requirements, or a requirement imposing a specific

26  "standard of accuracy."  This case also does *not* involve the implied false certification

27  theory addressed by the Supreme Court in *Universal Health Servs. v. United States ex*

28  *rel. Escobar*, ___ U.S. ___, 136 S. Ct. 1989 (2016).  To the contrary, United's

3

Attestations were factually and literally false because they misrepresented that its

payment data was accurate and truthful when at least some of it was not.

This case is also *not* about United's meritless "apples-to-apples" argument

regarding data verification, which argument United asserts before admitting that its

motion "does not address" this issue.  United's Memo. at 1.  In setting forth and then

removing this argument, United ignores that the Ninth Circuit already rejected it:

> According to the defendants, because CMS does not verify diagnosis codes
>
> submitted to it by third-party medical providers under the Medicare fee-for-
>
> service program, this provision means Medicare Advantage organizations
>
> were not required to verify diagnosis codes either.  We reject defendants'
>
> contention . . . for multiple reasons.

848 F.3d at 1179.[3]  Accordingly, for these and other reasons set forth below, United's

motion is meritless and should be denied.

## II.  MOTION TO DISMISS STANDARD

In deciding a motion to dismiss under Rule 12(b) of the Federal Rules of Civil

Procedure, the Court must accept as true all well-pled factual allegations in the

Complaint.  *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th

Cir. 1998); *see also Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination

Unit*, 507 U.S. 163, 164 (1993).  Furthermore, based upon these allegations, the Court

must draw all reasonable inferences in favor of the non-moving party, here, the United

---

[3] United's argument here is also factually incorrect (dooming its Administrative Procedure Act lawsuit challenging CMS' Overpayment Regulation) because neither the Medicare statute nor any CMS regulation exempts United from its obligations to submit valid data for Medicare payments and its regulatory obligations to implement effective compliance programs to ensure the validity of its data.  *See Swoben*, 848 F.3d at 1179 ("because nothing in § 422.310(d) speaks to a Medicare Advantage organization's obligations to ensure the accuracy of risk adjustment data, it does not modify a Medicare Advantage organization's obligations under §§ 422.503(b)(4)(vi) [the compliance regulation] and 422.504(l) [the Risk Adjustment Attestation regulation]").  United's argument also fails because neither the Medicare statute nor any CMS regulation entitles United to receive or keep risk adjustment payments based on diagnoses that are unsubstantiated by beneficiaries' medical records or are otherwise invalid.

4

States. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005); *see also Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969).[4]

An FCA action must also meet Rule 9(b) requirements. *Swoben*, 848 F.3d at 1180; *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). To meet Rule 9(b), a complaint "must provide enough detail 'to give [the defendant] notice of the particular misconduct which is alleged to constitute the fraud charged so that [it] can defend against the charge and not just deny that [it has] done anything wrong.'" *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citations omitted). If dismissal is appropriate, amendments are liberally allowed. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

Although courts generally look to the face of the complaint in deciding a motion to dismiss, a court may also consider documents attached to or referenced in the complaint or matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (documents not physically attached if authenticity is not contested and complaint relies on them), *overruled on other grounds*, *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002); *Branch v. Tunnel*, 14 F.3d 449, 453-54 (9th Cir. 1994) (document whose contents are alleged in a complaint if no party disputes authenticity), *overruled on other grounds, Galbraith*, 307 F.3d at 1125-26.

## III.    ARGUMENT

## A.    Law of the Case, Rule of Mandate, and *Stare Decisis* Preclude United From Challenging the Legal Sufficiency of the United States' Complaint

In moving to dismiss, United ignores that it did so once before and that the Ninth Circuit ruled on its motion. United's attempt to get a second bite at the apple is barred. Under the law of the case doctrine, "the decision of an appellate court on a legal issue

---

[4] United fails to apply, or even cite, the appropriate motion to dismiss standard, except as to its fifth argument regarding the particular "roles of any of the United Defendants," for which it only cites Rule 9(b). *See* United's Memo. at 21.

must be followed in all subsequent proceedings in the same case." *Alaimalo v. United States*, 645 F.3d 1043, 1049 (9th Cir. 2011) (citation omitted); *Chevron USA, Inc. v. Bronster*, 363 F.3d 846, 849 (9th Cir. 2004) (same), *rev'd on other grounds*, *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 528 (2005). The doctrine applies both to issues "decided explicitly" and those decided "by necessary implication." *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (citations omitted). "A party cannot offer up successively different legal or factual theories that could have been presented in a prior request for review." *Secs. Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996) (citation omitted); *see also United States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004) (stating that, "in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided") (citation omitted).

Similarly, under the rule of mandate doctrine, a variant of the law of the case, "a lower court receiving a mandate cannot vary it or examine it for any other purpose than execution." *Sanchez v. Astrue*, 2012 WL 3704756, at *10 (E.D. Cal. Aug. 27, 2012) (*citing United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1996)) (internal quotes omitted). "The rule of mandate requires that, on remand, the lower court's actions must be consistent with both the letter *and the spirit* of the higher court's decision." *Id.* (internal quotes and cites omitted) (emphasis in original). The rule of mandate bars even arguments that were not, but could have been, raised. *See Babauta v. Babauta*, 2013 WL 5430174, at *6 (Guam Aug. 20, 2013) ("the mandate rule thus holds that, where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand") (citation omitted). "By limiting subsequent proceedings to only those issues falling within the scope of the appellate court's mandate, the rule ensures that litigants in remanded cases get only one bite at the apple, foreclosing relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Perez*, 2012 WL 3642849, at *1 (4th Cir. Aug. 24, 2012).

The doctrine of s*tare decisis* is also relevant here. This doctrine is premised on "the idea that today's Court should stand by yesterday's decisions" and "is a foundation

1  stone of the rule of law." *Kimble v. Marvel Entm't, LLC*, ___ U.S. ___, 135 S. Ct. 2401,

2  2409 (2015) (internal quotes and citation omitted).  It is "the doctrine by which courts

3  adhere to previous decisions and refrain from disturbing settled issues."  *In re Deboer*,

4  1999 WL 33486710, at *2 (Bankr. D. Idaho July 20, 1999).

5      In this case, the Ninth Circuit has already ruled that Swoben's then-proposed FAC

6  sufficiently alleged "a cognizable legal theory" and "satisfie[d] Rule 9(b)" requirements

7  as to United.  848 F.3d at 1176, 1181.  The mere fact that the decision was based on

8  Swoben's proposed FAC, and not the United States' Complaint, is irrelevant.  The Ninth

9  Circuit's express rejection of United's challenge to Swoben's allegations forecloses any

10  basis to challenge the substantially identical, but much more detailed, allegations in the

11  United States' Complaint.  *See* V*anleeuween v. Keyuan Petrochemicals, Inc.,* 2013 WL

12  2247394, *10 (C.D. Cal. May 9, 2013)* (stating that "the Court is not dealing with a

13  'completely different' version of the allegations such that it may be required to reach a

14  different conclusion than it did in addressing Keyuan's motion to dismiss" and that later

15  motion "asks the Court to consider the sufficiency of the exact same allegations it

16  considered in ruling on Keyuan's motion" and holding that it "does not provide a basis

17  for declining to apply the law of the case doctrine") (citation omitted).

18      Likewise, it also does not matter that the United States had not yet formally

19  intervened in the action, as it was the real party in interest.  *United States ex rel. Zissler*

20  *v. Regents of the Univ. of Minn.*, 154 F.3d 870, 872 (9th Cir. 1998) ("Even in cases

21  where the United States has declined to intervene," the government "remains the real

22  party in interest."); *see also Disimone v. Browner*, 121 F.3d 1262, 1267 (9th Cir. 1997);

23  *Vanleeuwen*, 2013 WL 2247394, at *9.

24      In any event, even when the law of the case doctrine does not apply because

25  different parties are involved in the proceedings, the doctrine of *stare decisis*

26  nevertheless precludes re-litigation.  *See In re Staff Mortgage & Investment Corp.*, 625

27  F.2d 281, 283 (9th Cir. 1980) (applying *stare decisis* to bar a subsequent proceeding in

28  which the law of the case did not apply because the earlier proceeding involved a

1    different plaintiff).  And, as stated, the rule of mandate doctrine precludes United's

2    motion.  *See Babauta*, 2013 WL 5430174, at *7; *Sanchez*, 2012 WL 3704756, at *18.

3        Accordingly, United's renewed challenge of the theory of FCA liability and the

4    sufficiency of the allegations in the United States' Complaint (the first, second, and fifth

5    arguments in its brief) are barred by the doctrines of law of the case, rule of mandate,

6    and *stare decisis*.  Nevertheless, for the sake of completeness, the United States

7    addresses below the merits of each of United's five arguments.

8    **B.    United's Arguments are Meritless**

9        **1.    The Complaint Adequately Alleges "Knowledge"**

10       There is no merit to United's argument that the Court should require the United

11   States to plead facts showing that the individual corporate officers who signed the

12   Attestations did so "knowingly," that is, with actual knowledge of falsity of the risk

13   adjustment data, or with deliberate ignorance or reckless disregard of the falsity of the

14   data.  *See* United's Memo. at 7-8.  United ignores the fact that FCA liability is not

15   limited to the person who submitted the false claim or made the false statement, and does

16   not require proof that that person acted knowingly.  By its literal terms, the FCA also

17   reaches those who "cause" another to submit a false claim or make a false statement, as

18   long as persons who cause the claim to be submitted or the statement to be made have

19   the required knowledge.  31 U.S.C. § 3729(a)(1)(A), (B).[5]  Thus, since the United States

20   has alleged that United knowingly *caused* the submission of false Attestations, it is not

21   also required to plead additional facts showing that individuals who signed those

22   Attestations on United's behalf did so knowingly.

23       Moreover, United's "ignorant certifier" defense (*i.e.*, that its CFOs did not

24   "knowingly" submit false Attestations) must be rejected.  As stated in *United States ex*

25   *rel. Rigsby v. State Farm Fire & Cas. Co.,* 794 F.3d 457, 479 (5th Cir. 2015), *aff'd*, 137

26

27   _____

28   [5] As previously stated, the United States alleges in this case that the false
     Attestations were both false claims under § 3729(a)(1)(A) and false statements under §
     3729(a)(1)(B) of the FCA.

1   S. Ct. 436 (2016), this defense, based on a "constricted theory of liability would enable

2   managers at an organization to concoct a fraudulent scheme – leaving it to their

3   unsuspecting subordinates to carry it out on the ground – without fear of reprisal."  The

4   "FCA is not so limited" because it "provides for liability where a defendant knowingly

5   'causes to be presented' a false claim or knowingly 'cause[s]' a false record to be made

6   or used."  *Id.* (citation omitted).  Any other rule would immunize United from liability

7   simply by ensuring that signers of attestations are kept in the dark about company fraud.

8   *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908,

9   919 (4th Cir. 2003) ("We decline to adopt Westinghouse's 'single actor' requirement in

10  this false certification case.  In particular, we decline to adopt Westinghouse's view that

11  a single employee must know both the wrongful conduct and the certification

12  requirement.  If we established such a rule, corporations would establish segregated

13  'certifying' offices that did nothing more than execute government contract

14  certifications, thereby immunizing themselves against FCA liability.").

15       Accordingly, in an FCA case, a complaint need not allege that an individual

16  officer signing the Attestation did so knowingly.  *See United States ex rel. Bledsoe v.*

17  *Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007) ("The identity of the natural

18  person within the corporate defendant who submitted false claims is not an essential

19  element of a FCA violation.…  Where, as here, the relator has alleged that the

20  corporation has committed the fraudulent acts, it is the identity of the corporation, not

21  the identity of the natural person, that the relator must necessarily plead with

22  particularity."); *see also Harrison*, 352 F.3d at 919-20 and n.12 (stating that "corporation

23  can be held liable under the FCA even if the certifying employee was unaware of the

24  wrongful conduct").

25       Moreover, the Ninth Circuit has foreclosed any argument that an FCA complaint

26  must plead that the signer of an Attestation do so knowingly.  If the United States were

27  required to allege personal knowledge by the officers signing United's Attestations, then

28  so was Swoben.  But he did not do so, and the Ninth Circuit nevertheless held that

9

1   Swoben's proposed FAC satisfied Rules 8, 9(b), and 12(b)(6).  The Ninth Circuit so held

2   even though Swoben did not identify the officers who signed on behalf of the United

3   MAO at issue, defendant UHC of California (formerly called PacifiCare of California).

4   As recognized by the Ninth Circuit, the identity of the individual officers is

5   inconsequential because it was the MAO that certified the data's validity:

6           Because Medicare Advantage organizations have a financial incentive to

7           exaggerate an enrollee's health risks by reporting diagnosis codes that may

8           not be supported by the enrollee's medical records, Medicare regulations

9           require a *Medicare Advantage organization*, as an express condition of

10          receiving payment, to "certify (based on best knowledge, information, and

11          belief) that the [risk adjustment] data it submits . . . are accurate, complete

12          and truthful."

13  848 F.3d at 1166 (*quoting* 42 C.F.R. § 422.504(l), (l)(2)) (emphasis added).  The officers

14  who signed the Attestations did so *on behalf of* the MAO, not on their own behalf.[6]

15          The Ninth Circuit also already rejected United's "ignorant certifier" defense when

16  it ruled that United always had "an obligation to take steps to ensure the accuracy,

17  completeness, and truthfulness" of its data and that, when United avoids identifying

18  erroneously submitted diagnoses codes, it "can no longer certify, based on best

19  knowledge, information and belief the accuracy, completeness and truthfulness of the

20  data submitted to CMS."  *Id.* at 1174-75.  The CFOs who signed the Attestations on

21  behalf of the MAO, UHC of California, had the same obligation.  To the extent that they

22  failed to fulfill that obligation, they were deliberately ignorant of or recklessly

23

24          [6] It is, in fact, an agreement between the MAO and CMS that requires the
25  submission of this Attestation; there is no separate agreement between the signing officer
    and CMS.  *See* 42 C.F.R. § 422.504 ("The contract between the MA organization and
26  CMS must contain the following provisions:").  Furthermore, the Attestation is a
    condition for the MAO to receive payments from the Medicare Program; the officer does
27  not receive any payments from the Medicare Program.  The MAO also agrees that, as a
    condition for it to receive payments, an officer will request those payments on its behalf
28  on a document certifying the validity of the data that the MAO, not the officer, submitted
    to the Medicare Program.  *See* § 422.504(l).

                                              10

disregarded the truth and their scienter can be established based on that alone.  That scienter is imputed to the corporate defendants here.  As *Rigsby* stated, it is a reasonable inference that one employee alone had all the knowledge because he acted in reckless disregard of the truth of the information and "caused" a false claim to be presented and a false record to be made or used.  794 F.3d at 479-80.  Under the FCA, it is appropriate to hold a corporate defendant liable based on proof of this type of scienter.  *Id*. at 480.

The Ninth Circuit even held that Swoben "need not identify specific false § 422.504(l) certifications."  848 F.3d at 1183 (footnote omitted).  Relying on that statement, the United States did not do so in its Complaint.  However, if this Court concludes that United's arguments are not barred by the law of the case and other doctrines, *see supra*, and that examination of the Attestations is necessary, it can and should consider their contents.  The United States' Complaint expressly referenced them, *see* Compl. ¶ 108, and an example of such an Attestation is attached hereto as Exhibit 1.[7]

The Attestations are all very similar.  Like other Attestations, Exhibit 1 was signed by the CFO of the group within UnitedHealthcare, Inc. that managed United's MAOs and MA Plans at the time that particular Attestation was signed.[8]  The CFO signed "[o]n behalf of the UnitedHealth Group entities" listed on an attachment to the Attestation. The list includes the California MAO, PacifiCare of California (now UHC of California). Ex. 1.  The first paragraph of the Attestation refers to UnitedHealth Group and the affiliated entities on the list collectively as the "MA Organization" and states that "the MA Organization hereby requests payment under the contract and, in doing so, makes the following attestation concerning CMS payments to the MA Organization.*"  *Id*.  The asterisk refers to a footnote, which was not a part of the standard form drafted by CMS

---

[7] Since these Attestations were filed with CMS and are government documents, their authenticity is indisputable.

[8] In a declaration United recently filed in *United States ex rel. Poehling v. United Health Group*, No. 16-08697 (C.D. Cal.), the Executive Vice President of Optum, one of the United defendants here, explained that defendant UnitedHealthcare, Inc. is the entity that submits both the claims for payments and the annual Risk Adjustment Attestations to CMS and receives the risk adjusted payments.  *See Poehling* Docket No. 134-2, ¶ 3.

but was added by United, noting that the Attestation is based on "facts reasonably available or made available to the MA Organization." *Id*. The first paragraph of the Attestation further states that "[t]he MA Organization acknowledges that . . . misrepresentations to CMS about the accuracy of [risk adjustment] information may result in Federal civil action and/or criminal prosecution." *Id*.

As is evident from the Attestation, the statements therein are based on the MAO's knowledge and information, not that of the individual corporate officer. Accordingly, in assessing whether the MAO or its agents or principals[9] *knowingly caused* false Attestations to be "submitted," "presented," or "made or used," 31 U.S.C. § 3729(a)(1)(A), (B), the focus must be on their knowledge and information, not the individual officer's knowledge or information known to him. Thus, the Complaint sufficiently pleads that the MAO and the other defendants *knowingly caused* the submission, presentation, making, and use of the false Attestations and states viable claims against them under § 3729(a)(1)(A), (B), and (G) of the FCA.

United's cases do not support its argument that the United States must plead facts showing that an individual officer knowingly signed the false Attestations. *United States ex rel. Modglin v. DJO Global Inc.*, 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015), *aff'd*, *United States v. DJO Global, Inc.*, 678 Fed. Appx. 594 (9th Cir. 2017), did not address the issue of whether, in an FCA case, the United States must plead that the signing officer had the requisite scienter. Rather, the court held that the relators did not adequately allege scienter because their allegations failed to point to any law, regulation, or other requirement that would have put the defendants on notice that they needed to disclose that they were seeking Medicare reimbursement for devices prescribed for an off-label (unapproved) use and, thus, "[n]o facts alleged by relators [gave] rise to a reasonable inference that defendants were on notice they were filing false claims." *Id*.

---

[9] The other corporate defendants were agents or principals of the United MAO, UHC of California. For example, Optum submitted risk adjustment data to CMS on behalf of the MAO, *see* Compl. ¶ 18, and UnitedHealth Group and UnitedHealthcare controlled and managed the MAO, *see id*. ¶¶ 15, 19.

Likewise, *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) ("*SAIC*"), is unhelpful.  There, the D.C. Circuit merely held that jury instructions improperly allowed the jury to find corporate scienter under the so-called collective knowledge theory by piecing together scraps of "innocent knowledge" held by various corporate employees so as to hold the company liable based on negligence or mistake, in lieu of finding that corporate officials acted with deliberate ignorance or reckless disregard for the truth in submitting a claim.  *Id*. at 1275.  The court, however, recognized that the jury could have properly found liability based on the "actual knowledge possessed by individual employees" *or* "the actions of employees or [the company's] systems and structure" could have led the jury to conclude that it "acted recklessly or with deliberate ignorance of the truth."  *Id.* at 1276.  It also acknowledged that the FCA's definition of "knowingly" was intended "to capture the ostrich-like conduct which can occur in large corporations where corporate officers insulate themselves from knowledge of false claims submitted by lower-level subordinates" and that "Congress defined 'knowingly' to include some forms of constructive knowledge" and to impose "liability for mistakenly false claims . . . when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence."  *Id*. at 1274-76 (citations and internal quotes omitted).  *SAIC* also did not involve a motion to dismiss. *See United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 50 (D. D.C. 2015) (distinguishing *SAIC* for this reason and holding that the relator's failure to identify a specific employee who knew he or she was submitting a false claim for payment or was making a false statement to the government was not fatal at the motion to dismiss stage).

Similarly, *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, *21 (C.D. Cal. May 23, 2008), and the other Public Securities Litigation Reform Act ("PSLRA") cases United cites are inapposite.  As this Court explained in *Rectifier*, "the PSLRA requires a heightened pleading standard for state of mind:  'the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id*.

1  at *9 (*quoting* 15 U.S.C. § 78u-4(b)(2)).  In contrast, the FCA's definitions of "knowing"

2  and "knowingly" "require no proof of specific intent to defraud."  31 U.S.C. §

3  3729(b)(1)(B); *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1049 (9th

4  Cir. 2012) (holding that, in requiring intent to deceive, district court "employed the

5  wrong legal standard for determining FCA liability with regard to whether Hooper had

6  established that Lockheed 'knowingly' submitted a fraudulent underbid) (footnote

7  omitted); *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 452-53 (W.D. Pa.

8  2012) (stating that PSLRA "changed [the] standard in regard to inferences involving

9  factual allegations relating to scienter in securities law cases," rejecting as "misplaced"

10 the argument that "the individual corporate officer making the statement must have the

11 requisite scienter" and noting that "[n]o such requirement exists in the False Claims

12 Act") (citations omitted); *City & County of San Francisco v. Tutor-Saliba Corp.*, 2005

13 WL 645389, at *9 (N.D. Cal. Mar. 17, 2005) (agreeing with the plaintiffs that securities

14 fraud cases brought under the PSLRA impose a higher pleading standard for scienter

15 than Rule 9(b), which governs FCA cases).  Likewise, *Nordstrom, Inc. v. Chubb & Son,*

16 *Inc.,* 54 F.3d 1424, 1435 (9th Cir. 1995), was an insurance coverage case that did not

17 address or decide the issue of whether an FCA complaint must allege that the signer of a

18 false Attestation did so knowingly and is clearly inapposite here.  Thus, United's

19 arguments regarding "knowledge" are meritless and should be rejected.

20        **2.**    **The Complaint Adequately Alleges "Materiality"**

21        The United States alleges that United violated § 3729(a)(1)(A) by submitting false

22 claims for payments and identifies those false claims as the Attestations.  Compl. ¶ 111.

23 The Ninth Circuit, in *Swoben*, recognized the validity of this § 3729(a)(1)(A) claim:

24 "Under Swoben's theory, … the false claims are the allegedly false § 422.504(l)

25 certifications, not the erroneously reported diagnosis codes."  848 F.3d at 1183 (citation

26 omitted).  These Attestations were literally and factually false claims because they

27 included an explicit lie and they were claims for payment.  *See United States ex rel.*

28 *Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) ("The 'factually false'

theory refers to the 'archetypal *qui tam* False Claims Action' in which 'a private company overcharges under a government contract, [and] the claim for payment itself is literally false or fraudulent'"); *United States ex rel. Dresser v. Qualium Corp.*, 2016 WL 3880763, at *5 (N.D. Cal. July 18, 2016) (stating that "[t]he literally false theory says that an FCA action may lie where 'the claim for payment is itself literally false or fraudulent'" and holding that the United States adequately pled that the claims were literally false because they contained lies) (*quoting Hendow*, 461 F.3d at 1170); *Modglin*, 114 F. Supp. 3d at 1010 ("The prototypical false claims action alleges a factually false claim, *i.e.*, an explicit lie in a claim for payment, such as an overstatement of the amount due.") (citation omitted); *see also United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 305 (3rd Cir. 2011) (explaining difference between "factually false" and "legally false" FCA claims). The Attestations falsely represented that the diagnoses submitted were accurate and truthful when at least some of them were not.

When a claim is literally false, as is the case here, this Court should conclude (and is bound by the Ninth Circuit's decision to conclude) that a lie about the accuracy and truthfulness of the very data – here, diagnoses – upon which payments are calculated and made is indisputably material. *See* Compl. ¶¶ 37-44, 115 (explaining how diagnoses submitted by MAOs are used by CMS to calculate each beneficiaries' risk score, which is then used to determine risk adjustment payments). The "essence of the bargain" and the *sine qua non* of payment is that the beneficiaries' medical records substantiate the medical conditions indicated by the diagnosis codes relied on to calculate the risk scores and make the payments. The Ninth Circuit has already determined that such false statements are material, as it otherwise could not have held that claims against United based on them were cognizable under the FCA. Indeed, the *raison d'etre* of the requirement of a certification as to the validity of payment data is to serve as a "bulwark against fraud" by MAOs when claiming Medicare payments. *Swoben*, 848 F.3d at 1168. When such certifications fail to achieve that purpose, payments are made to unentitled MAOs and the false statement is necessarily material.

Further, the Complaint's allegations amply allege materiality.[10]  The Complaint alleges that MAOs and their MA Plans are not entitled to risk adjustment payments for diagnoses that are not supported and validated by medical records, that they are required to delete previously-submitted claims that include unsupported diagnoses, and that CMS recalculates beneficiaries' risk scores after final submission deadline to account for the deletion of unsupported diagnoses and thereby either avoids making or recovers improper payments.  *See, e.g.*, Complaint at ¶¶ 45-46 (explaining that, under Risk Adjustment Participation Guide, all diagnosis codes submitted by MAOs must be unambiguously supported by medical records created by the treating provider at the time of the medical encounter), ¶ 50 (citing regulations requiring MAOs to implement proactive compliance activities, including audits), ¶ 52 (alleging that "MA Organizations are responsible for deleting RAPS data submissions if the diagnoses that they submitted are invalid," thereby "allow[ing] CMS to recalculate the beneficiaries' risk scores and

---

[10] United significantly misrepresents *Escobar's* materiality standard.  United asserts that the "standard" is that the "complaint must . . . allege that the supposed violations 'are so central . . . that the [government] *would not have paid these claims* had it known of these violations.'"  United's Memo. at 11 (quoting *Escobar*, emphasis added by United).  However, the quoted passage comes from the Court's description of the particular allegations in that case, not what it stated was the standard.  The full sentence quoted only in part by United reads:  "Respondents have alleged that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations."  136 S. Ct. at 2004.  The Court then stated that "Respondents may well have adequately pleaded" a violation, but remanded for the courts below to resolve the issue.  *Id.*  As stated by *Escobar*, however, the test of materiality is whether a statement has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* at 2002 (*quoting Neder v. United States*, 527 U.S. 1, 16 (1999)).  *Escobar* then sets forth an holistic analysis considering several factors:  the label of the requirement, which examines whether the violated requirement is expressly identified as a condition of payment, and which is strong evidence of materiality even if "not automatically dispositive"; whether the violation goes to the "essence of the bargain," which examines whether the violated requirements were important to the government's overall purpose; whether the violation is significant or "minor or insubstantial," which discounts violations that are limited in scope or magnitude; and what actions the government took in response to the same or similar violations.  *Id.* at 2003-04; *see also United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 907 (9th Cir. 2017) (holding that, at the pleading stage, allegation of "more than the mere possibility that the government would be entitled to refuse payments if it were aware of the violations . . . sufficiently plead[ed] materiality at this stage of the case") (*citing United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017)).

1   ensure that the Medicare Program does not make improper risk adjustment payments . . .

2   [or] recovers improper payments"), and ¶ 56 (describing final reconciliation payment

3   process based on the recalculation of beneficiaries' risk scores and how it accounts for

4   deletion of invalid diagnoses).  The Complaint further alleges that CMS conducts Risk

5   Adjustment Data Validation (RADV) audits to recover monies paid for unsupported

6   diagnoses, *id*. ¶ 47, and that HHS's Office of the Inspector General ("OIG") does the

7   same, *id*. ¶ 79.  This is because, as stated, adequate medical record document of medical

8   conditions identified by diagnosis codes is a prerequisite to entitlement to payment.

9        In addition, the Complaint also alleges facts showing how a false certification

10  about the validity of invalid diagnoses is material to Medicare's payment of those invalid

11  diagnoses.  In particular, the Complaint alleges that certifying the validity of diagnostic

12  data is a regulatory and contractual condition of payment and that MA Organizations

13  must attest to the validity of their risk adjustment data, including diagnoses, after the

14  final submission deadline but before their receipt of the final reconciliation payments.

15  *Id*. ¶¶ 57-60.  It further alleges that United deliberately ignored or recklessly disregarded

16  the negative results of the chart reviews and did not delete the invalid diagnoses when it

17  certified the validity of its diagnostic data.  *Id*. ¶ 108.  And, it explains that, because of

18  this, the Medicare Program either (i) paid monies to United to which it was not entitled

19  as part of the final reconciliation payment (if payment had not yet made based on the

20  invalid diagnoses) or (ii) did not recover the monies it already paid as part of the final

21  reconciliation process or thereafter (if interim payments had already been made based on

22  the invalid diagnoses).  *Id*. ¶¶ 56, 90.

23       Under these circumstances, nothing could be more material.  Indeed, allegations

24  that United's Attestations falsely certified that the diagnoses it submitted were accurate,

25  complete, and truthful, when they were in fact known to have been invalidated by chart

26  reviews, show that the false statements were "so central" to Medicare's risk adjustment

27  program as to be indisputably material.  This is similar to the allegations regarding

28  unlicensed mental health counselors that the *Escobar* Court went out of its way to

1  suggest to courts below "may well have adequately pleaded" materiality.  136 S.Ct. at

2  2004.  And, as noted, this was also the Ninth Circuit's conclusion in this case when it

3  held that Swoben's FAC stated a cognizable theory, noting that the certifications at issue

4  were meant to be a "bulwark against fraud" and were "a condition to receiving

5  payment."  848 F.3d at 1168, 1176 (*citing* 42 C.F.R. § 422.504(l)).  Thus, the Complaint

6  sufficiently alleges materiality.[11]

7       **3.    The Reverse FCA Claims Were Not Waived**

8       United next argues that the United States' "reverse false claims" theory under

9  § 3729(a)(1)(G) has been waived and cannot be revived.  United does not base its

10  argument on any of the Complaint's allegations or on any document of which it asks the

11  Court to take judicial notice, but on footnote 6 of the Ninth Circuit's decision.  United's

12  Memo. at 13.[12]  That footnote, however, merely observes that Swoben "did not rely" on

13  the reverse false claims provision in his briefs and states that the court would "not

14  address it" in its opinion.  848 F.3d at 1172 n.6.  This does not amount to a ruling that

15  Swoben waived his reverse false claims theory, particularly given that he appealed the

16  entire judgment entered in this case, *see* Docket No. 137 (appealing the "judgment

17  entered on September, 2013), and the Ninth Circuit's understanding that Swoben

18  appealed the dismissal of his entire action, which included reverse false claims theories.

19

---

20  [11] United's cases here are inapposite.  *City of Chicago v. Purdue Pharma L.P.*, 211
21  F. Supp. 3d 1058, 1078-79  (N.D. Ill. 2016), an out-of-district case, involved allegations
    regarding the City of Chicago's actual knowledge of noncompliance with a medical
22  necessity requirement, whereas the Complaint in this case does not allege that CMS had
    actual knowledge that particular diagnoses were unsupported before paying for them,
23  Similarly, *United States ex rel. Dresser v. Qualium Corp.*, 2016 WL 3880763, helps the
    United States, not United.  While, in the part of the case dealing with an implied
24  certification theory, not applicable here, it stated that conclusory allegations that the
    government would not have paid, but "d[id] not explain why," failed to show materiality,
25  *id.* at *6, in the parts of the case addressing the literally false and express certification
    theories, similar to this case, it held that materiality was sufficiently pled where the
26  complaint alleged that "certification was material to the government's decision to
    reimburse Defendants for their claims, because Medicare would only pay for sleep and
27  titration tests performed by licensed or registered sleep technicians," *id.* at *5.  This is
    like the requirement here that risk adjustment payments be supported by medical records.
28  [12] United also assumes that Swoben waived the reverse false claims issue at the
    trial level.  *Id.* at 13.  This argument is offered without any support and must be rejected.

18

1    As an initial matter, any waiver by Swoben cannot affect the United States' ability

2 to assert its claims.  First, while the judgment in this case dismissed Swoben's Third

3 Amended Complaint "with prejudice regarding Relator James M. Swoben," it expressly

4 dismissed "without prejudice regarding the United States of America as to Defendants

5 and each of them."  Judgment Dismissing Third Amended Complaint at 3 (Docket No.

6 135).  Second, under the FCA, Swoben lacked the power to waive or dismiss the United

7 States' claims without its written consent.  31 U.S.C. § 3730(b)(1) (action may be

8 dismissed "only if the court and the Attorney General give written consent to the

9 dismissal and their reasons for consenting").  Third, even if Swoben's conduct on appeal

10 narrowed the claims he was asserting, the FCA permits the government, upon

11 intervention, to assert claims beyond Swoben's.  31 U.S.C. § 3731(c) (upon intervention,

12 the government may "add any additional claims with respect to which the Government

13 contends it is entitled to relief").  Thus, regardless of whether Swoben waived his reverse

14 false claims theory, the United States remains free to pursue it.

15    Moreover, a waiver of claims is "disfavored in the law" and must be

16 unequivocally shown.  *Carpenter v. Tahoe Reg. Planning Agency*, 804 F. Supp. 1316,

17 1322 (D. Nev. 1992) (stating that evidence of waiver "would have to be extremely

18 strong" for a party to win an argument that a claim has been waived); *see also Veritas

19 Operating Corp. v. Microsoft Corp.*, 2008 WL 474248, at *12 (W.D. Wash. Feb. 4,

20 2008) (declining to hold that evidence showed that claims were barred by waiver, laches,

21 or estoppel, which is "not favored").  This is particularly so in the context of a reverse

22 false claim, which is substantively similar to traditional FCA claims under

23 § 3729(a)(1)(A) or (B).  Both the traditional and reverse FCA claims in this case rely on

24 the notion that United's failure to delete diagnoses codes that were known to be invalid

25 was improper.  A reverse false claim merely arises when a party owes the government an

26 obligation to pay back money.  *See United States ex rel. Huangyan Imp. & Exp. Corp. v.

27 Nature's Farm Prods., Inc.*, 370 F. Supp. 2d 993, 998 (N.D. Cal. 2005) (reverse false

28 claims arise when "the financial obligation that is the subject of the fraud flows in the

19

opposite of the usual direction"); *see also United States v. Bourseau*, 531 F.3d 1159, 1164-71 (9th Cir. 2008) (describing reverse false claims elements as being similar to traditional FCA claims). A separate discussion of reverse false claims was unnecessary because such claims rise or fall on the strength of traditional FCA claims. *See United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d at 336 ("Because Kelly's cause of action for submitting false or fraudulent claims for payment fails as a matter of law, so too does his 'reverse false claims' cause of action."). Thus, the reverse false claims theories were subsumed in and became a part of the traditional FCA theories. Indeed, Swoben's Third Amended Complaint included both traditional and reverse FCA theories within his Third and Ninth Claims against United. *See* Docket No. 37, ¶¶ 49-52, 131-33.

This view is borne out by the Ninth Circuit's ruling, which merely held that "Swoben has alleged a cognizable legal theory" and that "the proposed fourth amended complaint satisfies Rule 9(b) with respect to United Healthcare and HealthCare Partners" and vacated and remanded the judgment. 848 F.3d at 1176, 1182, 1185. In so holding, the Ninth Circuit did not carve out any exception for Swoben's reverse false claims based on any waiver and this Court should not do so.

### 4.    Claims for Pre-2007 Violations Are Not Barred and the Complaint Relates Back to Conduct Alleged by Swoben in 2010

The FCA sets out two limitations periods. Section 3731(b)(1) provides that an FCA case must be brought within six years of the date an FCA violation was committed. Section 3731(b)(2) provides that a civil action may not be brought more than three years after a responsible government official learns of facts material to the alleged fraud, but in no event more than ten years after the date on which the violation was committed. The "in no event more than ten years" language in (b)(2) does not apply to (b)(1). Any other conclusion would be illogical. It would extend a six-year limit from the date of the violation into a ten-year limit. The "in no event more than ten years" language only applies to (b)(2) because the three-year equitable tolling provision in (b)(2) – which is equitable because it is based on learning about facts – otherwise has no cut-off date.

Without the "in no event more than ten years" language, the statute of limitation in (b)(2) would be indefinite. For example, the United States could file an action fifteen years after the violation if it learned of the violation twelve years after it occurs.

Moreover, the "in no event more than ten years" language in (b)(2) has no bearing on the application of the "relation-back" section 3731(c), which states:

> For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of [relator], to the extent that the claim of the Government arises out of the conduct transactions, or occurrences set forth or attempted to be set forth in the prior complaint of [relator].

Had Congress intended to impose a ten-year limit on section (c)'s relation-back provision, it would have done so as it did in section (b)(2), but it did not. United fails to cite any authority to support that the "in no event more than ten years" language in (b)(2) puts such a limit on section (c), and the United States is unaware of any such authority.

*United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996), does not help United, as that case did not address this issue. Also, unlike this case, in which the United States is not relying on section (b)(2), *Hyatt* concerned section (b)(2) in a case in which the government did *not* intervene and the relator was relying on (b)(2). Thus, it has no bearing on the relation-back issue here. None of the other cases United cites comes any closer. United's reliance on legislative history, United's Memo. at 17, is also unavailing, as nothing in the legislative history indicates that Congress intended to limit relation-back provision to the ten-year period in section (b)(2). Such a construction further contravenes the well-accepted principle that statutes must be construed pursuant to their plain language.

In this case, the United States is relying on section 3731(b)(1)'s six-year limitation period, the "relation-back" section 3731(c), and the fact that, in October 2010, Swoben filed his FCA claims against United based on the one-sided chart reviews that it conducted of beneficiaries enrolled in UHC of California (formerly PacifiCare of

1    California).  *See* Docket No. 23 (Swoben's Second Amended Complaint ("SAC"))

2    ¶¶ 36-52.  The allegations in the United States' Complaint about United's role in chart

3    reviews of HCP's patients starting in 2005 relate back to the allegations "set forth or

4    attempted to be set forth" by Swoben in 2010.  § 3731(c).  There is no merit to United's

5    argument that the United States' allegations do not relate back because they purportedly

6    go beyond the time period in Swoben's 2010 complaint against it.  The United States'

7    Complaint does not expand the timeframe of the earlier pleading; rather, the Complaint

8    adds details about United's involvement with one of its physician groups, HCP –

9    including such involvement during the 2005-2007 period.

10        Since at least October 2010, a central allegation in this case has been that

11   defendants "improperly conceived, planned and conducted the coding companies'

12   review by not causing the previously submitted diagnostic codes that were unsupported

13   by the coding companies' reviews to be corrected" and that "during or about 2005 or

14   2006, [defendants] submitted to the Government and California the diagnostic codes

15   determined by the coding companies' review, knowing that the effect of such submission

16   would only increase the number of diagnoses, and thus artificially inflate their respective

17   risk scores."  SAC ¶¶ 42, 43.[13]  The United States' Complaint merely clarifies that

18   United's conduct affected the truthfulness of the risk scores for HCP patients during the

19   period referenced in the SAC.  Such clarification is permitted by § 3731(c)'s relation-

20   back provision and United's argument fails.

21

22

23        _____

         [13] In his SAC, Swoben refers to United as Secure Horizons, the brand name for the
24   California MA Plan.  *Id.* ¶ 9.  Swoben alleged that Secure Horizons violated the FCA by
     failing to delete or otherwise correct diagnosis codes that it had previously submitted for
25   payments but which were unsupported by chart reviews conducted by diagnosis coding
     companies that it had retained.  *Id.* ¶¶ 37-52.  Swoben made specific reference to Secure
26   Horizons retaining the coding companies "during or *about* 2005" and to Secure Horizons
     artificially inflating its Medicare beneficiaries' risk scores "during or *about* 2005 or
27   2006" by failing to delete or correct the unsupported diagnosis codes when submitting
     the additional codes identified during the chart reviews.  *Id.* ¶¶ 38, 43 (emphasis added).
28   These allegations are not as confining as United contends.

### 5.      The Complaint Adequately Alleges the Defendants' Roles in Defrauding the Medicare Advantage Program

United contends that the Complaint fails to satisfy Rule 9(b) because it does not specify the particular role played by each defendant in the fraudulent scheme.  The Ninth Circuit, however, has already held that "[t]here is no flaw in a pleading … where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."  *Swoben*, 848 F.3d at 1184.[14]

Moreover, the United States' Complaint alleges sufficient facts about the role of the only two defendants named by it but not by Swoben:  Optum, Inc. and OptumInsight, Inc. (collectively "Optum"), which are subsidiaries of defendant UnitedHealth Group.  Compl. ¶ 18.  The Complaint alleges that Optum and its predecessor, Ingenix, were involved in the chart reviews at issue in the action and were the entities that submitted risk adjustment data to the Medicare Program on behalf of the MA Plans.  *Id*.  It also explains that Optum had shared responsibility with the other United defendants for reporting invalid diagnoses to the Medicare Program and returning the overpayments to the program.  *Id*.  The Complaint identifies the particular Optum employees who ran United's risk adjustment and chart review programs and includes detailed allegations about these employees and their knowledge that the invalid codes should have been deleted.  *Id*.  ¶¶ 64-77, 80-81, 82, 85, and 98.

In addition, the roles of the other defendants are described in the Complaint.  It alleges that defendant UHC of California, the MAO, is also known as the United MA Plan in California and it is the plan in which the HCP patients were enrolled.  *Id*. ¶¶ 6 and 16.  The Complaint also alleges that defendant UnitedHealthcare oversaw and

---

[14] This holding also applies to the successors of two of the United defendants named in Swoben's FAC.  The United States' Complaint names United HealthCare Services as a defendant because it is the successor to PacifiCare Health Systems and PacifiCare Health Plan Administrators.  Compl. ¶ 6.  PacifiCare Health Plan Administrator was the entity that ran the chart review program with HCP on behalf of the California MAO, PacifiCare of California, before that work was transferred to Ingenix (now known as Optum) in or about 2007.  *Id*. ¶¶ 93, 94 and documents referenced therein.

managed the United MAOs and MA Plans, as well as the California MAO and MA Plan, and that its responsibilities included obtaining risk adjustment payments from the Medicare Program for the MAOs and their plans. *Id*. ¶ 19. The Attestations also show that the signers were CFOs of groups located within defendant UnitedHealthcare. *See* Ex. 1 (showing signer as being UnitedHealthcare Medicare & Retirement Group CFO Scott Theisen). And, the Attestations show on their face that they were submitted on behalf of defendant UnitedHealth Group as well as its MAOs and MA Plans. *Id*.

There is also no merit to United's purported ignorance about the roles of the defendants in the matters alleged in paragraphs 63, 88, 93 and 108 of the Complaint. United's Memo. at 22-23. Paragraph 63 is a general allegation relating to United's knowledge that many provider-reported diagnoses were invalid and that general allegation is supported by the more detailed allegations in paragraphs 64 to 79 of the Complaint. Those allegations specifically describe the conduct of Dumcum, Will, Holt, and Leal, who all worked for Optum. Paragraph 88 describes the contract that United entered into with the coding vendor that conducted the chart reviews at issue and paragraph 93 describes United's funding of those chart reviews. As alleged in Paragraph 108, United submitted the Attestations and thus knows that the CFOs of groups within UnitedHealthcare signed the Attestations and that the Attestations expressly stated that they are being submitted on behalf of UnitedHealth Group. Thus, as the Ninth Circuit has already held, the allegations against the United defendants are sufficient.[15]

---

[15] United's cases here are inapposite. For instance, *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007), held that allegations relating to unrelated corporate defendants did not sufficiently apprise them of their separate roles in a conspiracy so that they could defend themselves. Here, UnitedHealth Group is the parent of all the other defendants and controls all of them. Compl. ¶¶ 15-20. There is only one United, as shown by the Attestations, which are signed by defendant UnitedHealthcare CFOs on behalf of defendant UnitedHealth Group and each of its MAOs and MA Plans. *See* Ex. 1. The Complaint groups together the United defendants because defendants do so themselves. *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d at 997-98, is also inapposite because the complaint there failed to allege sufficient detail about the roles of individual board of directors defendants. In contrast, the Complaint here alleges the separate roles that the corporate entities played in the false Attestations. For example, Optum operated a blind chart review program on behalf of United's MAO and MA

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny United's motion to dismiss.

Dated:  August 22, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
LINDA A. KONTOS
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JUSTIN DRAYCOTT
JESSICA KRIEG
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney

          /S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney
Attorneys for the United States of America

_____

Plans, whereas UnitedHealthcare, the entity responsible for managing United's MAOs and MA Plans, signed the Attestations on behalf of UnitedHealth Group and its MAO and MA Plans.  Also, *United States ex rel. Pecanic v. Sumitomo Electric Interconnect Prods., Inc.*, 2013 WL 774177, *5 (S.D. Cal. Feb. 28, 2013), and *United States v. Safran Group, S.A.*, 2017 WL 235197, *8 (N.D. Cal. Jan. 19, 2017), are distinguishable.  In *Pecanic*, the relator failed to identify which defendant, the corporate parent or subsidiary, made the false certifications.  2013 WL 774177, at *4.  Here, both the parent, UnitedHealth Group, and two subsidiaries, UnitedHealthcare and UHC of California, made the false Attestations and Optum caused them to be made.  In *Safran*, the relators' allegations made it impossible to discern who made the misrepresentations, when they were made, in what documents they were made, and what government agencies were involved and made the payments.  2017 WL 235197, at **8, 10-11.  Here, in contrast, the Attestations are the documents at issue; they show the names of the CFOs who signed them on behalf of UnitedHealth Group and its MAOs and MA Plans, including UHC of California; the Attestations are dated and show when they were made; they identify the signers as CFOs of particular groups that were a part of UnitedHealthcare, which, as alleged in paragraph 19 of the Complaint, managed the MAOs and MA Plans; and the Attestations show that they were made to the Medicare Program.  *See* Ex. 1.

25